UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT BRACKETT,<br><br>                    Petitioner,<br><br>     v.<br><br>LAWRENCE WASDEN and JOSH TEWALT,<br><br>                    Respondents. | Case No. 1:17-cv-00281-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Petitioner Robert Brackett ("Petitioner"), a former prisoner who is now on parole, is proceeding on his Amended Petition for Writ of Habeas Corpus challenging his state court convictions. Dkt. 28. Respondents Lawrence Wasden and Josh Tewalt (collectively "Respondent") filed a Response and Brief in Support of Dismissal, Petitioner filed a Reply, and Respondent filed a Sur-Reply. Dkts. 37, 49, 53.

The Court takes judicial notice of the records from Petitioner's state court proceedings lodged by the parties. Dkts. 11, 36, 40,[1] and various individual records attached as exhibits to Petitioner's filings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Having carefully reviewed the record, including the state court record, the Court

---

[1] All page number references to the trial transcript, found at State's Lodging A-7, are to the transcripts internal pages (four per page), and not to the lodging page numbers.

finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, for the reasons explained below, the Court enters the following Order denying the Petition for Writ of Habeas Corpus.

## BACKGROUND

### 1. Factual and Legal Basis of the Criminal Charges

Petitioner characterizes the background facts regarding his dealings with the minor victim, N.B. (or N.M.B.) and his difficulties with his proposed trial evidence, as follows:

> In January of 2011 42 year old Robert Brackett was accused of having a relationship with 16-year old N.M.B. in which he met on several different occasions at multiple different nightclubs and/or bars, as N.M.B. had falsified her identification of that of an adult. The defendant denied the allegations. At trial the defendant tried to bring to light the many previous false allegations made by N.M.B. regarding her father Robert Bailey to local authorities. However, the court rules this information was not admissible. Further the defendant attempted to make the jury aware of the issue of N.M.B. falsifying her identification and frequenting adult establishments. Again this defense was denied and ruled irrelevant and not admissible.

*State's Lodging B-3*, p. 3 (verbatim).[2]

On a tip from a third party that 16-year-old N.B. had a 40-something boyfriend who

---

[2] The Idaho Court of Appeals' opinion wrongly states that Petitioner was 46 years old when the crimes occurred. *See State's Lodging A-12, pp. 1-2*. Rather, he was 42, as set forth in the charging documents. *See State's Lodging A-3*, p. 186; Petitioner's Reply, Dkt. 49, pp. 1-2. At trial, it was made clear that he was 42. *See State's Lodging A-7*, p. 281 (In closing argument the prosecutor argued: "In October of 2010, Robert Brackett was 42 years old. Look at Exhibit 92. This will tell you his date of birth and his age." The Court has not relied on this mistake in the state appellate record. To the reasonable adult, however, there is little difference between whether a 42-year-old adult had a sexual relationship with a 16-year-old high school student, or a 46-year-old had a relationship with a 16-year-old high school student. Both are strictly prohibited by the laws of the state of Idaho.

had burned her arm with a cigarette lighter during an argument, two female Idaho Department of Health and Welfare officials and a female police detective called N.B. into a meeting at the high school to ask her about the relationship. *State's Lodging A-7*, pp. 197-98. N.B. told Detective Jocelyne Nunnally two or three times that nothing had happened between N.B. and Petitioner, that she did not want to talk about it, and that she "had already taken care of it." *Id.*, p. 197. However, after about five minutes, when N.B. was asked about a mark on her arm, N.B. told Detective Nunally something did happen. *Id.*, pp. 199-200, 418-19, 519-20, 2461.

On January 13, 2011, N.B. revealed to other police investigators that she had been involved in a sexual relationship with Petitioner from about October 2010 to January 2011. *State's Lodging A-1*, p. 1006. Eric Barzee, the officer who prepared the affidavit in support of the criminal complaint, stated that N.B. also said Petitioner had taken sexual pictures of her with her black camera kept at Petitioner's house. *State's Lodging A-3*, p. 127.

During the last several weeks of Petitioner and N.B.'s relationship. Petitioner's adult daughter, Summer Brackett, moved in with Petitioner. Summer kept her personal items in a cardboard box in the living room.  *State's Lodging A-7*, pp. 1148-1149.

On January 14, 2011, investigators obtained a search warrant for Petitioner's home and vehicle; the black camera N.B. had described was listed in the warrant.  *State's Lodging A-7*, pp. 834-38. Detectives found a silver Nikon 4600 Coolpix camera on the living room entertainment stand. *Id*, pp. 658, 803, 820, 836-838. No SD memory card was in the Nikon. *Id*., p. 1298. It had an internal memory; later, 74 non-exploitative pictures were retrieved from it. *Id*., pp. 1299-1300.

A Nokia T-Mobile phone was found in Petitioner's car. *Id.*, p. 838-839. A Samsung cell phone identified as Petitioner's primary phone was found between the driver's seat and center console. *Id.*, pp. 2176-77. N.B.'s parents allowed her Verizon LG phone to be examined and placed into evidence. *Id.*, p. 875. Detectives found no nude photos on N.B's cell phone. *Id.*, p. 1606.

Later, when examining Petitioner's cell phone, investigators found that Petitioner had sent a text message to Summer on January 14, telling her to erase the pictures on the camera that was in her personal box. *Id.*, pp. 17-19, 2831-2832; *see State's Lodging A-3*, pp. 291-301. Petitioner stated at trial that he never asked his daughter, Summer, to erase images from a camera *of an explicit nature*, just images from a party. *Id.*, p. 2717.

Investigators did not find the black camera they were looking for during their first search, conducted in Summer's presence. *Id.*, pp. 1814-1815. After investigators left Petitioner's home, Summer sent them a message that she had found the camera in a box of her personal property. Investigators obtained a second search warrant and returned to retrieve the camera from Summer. *State's Lodging A-3*, pp. 127-129. The camera was a black Samsung SL600 camera, serial number BI1026516095D, in a gray soft case. *State's Lodging A-7*, p. 11 (referencing State's Exhibit 19), pp. 196, 846-848, 1847.

At trial, N.B. testified that "Bud" [later identified as Jack Omohundro] gave her the black Samsung camera. She left it at Petitioner's house and took it out when she and Petitioner would go somewhere, but she never took it home. *State's Lodging A-7*, pp. 252-254. She testified Petitioner took pictures of her with that camera (hereafter, the camera will be referred to as "Petitioner's camera"). *Id.*, p. 253. She testified that Petitioner took

pictures of her at Bud's house on Petitioner's camera, that she and Petitioner scrolled through them together, and that, later, Petitioner told her he had erased them. *Id*., pp. 299-300.

Petitioner was arrested and arraigned on January 14, 2011, after a recorded police-monitored confrontation call between N.B. and Petitioner. *Id.*, pp. 539-543. Detectives obtained a third search warrant to search the Nikon and Samsung cameras and the blue SanDisk 8-gigabyte SD card in the Samsung camera. *See State's Lodging A-9*, p. 14.

Petitioner's black Samsung camera was taken to the FBI's Intermountain West Regional Computer Forensic Laboratory. Forensic examiner Don Lukasik recovered at least 269 deleted images from the SD card in Petitioner's camera. The images showed N.B.'s exposed vagina, N.B.'s hand touching a naked penis, and N.B.'s mouth touching a naked penis held in a man's hand. The detective prepared a forensic report of his analysis of the SD card, which included images recovered from the SD card. *State's Lodging A-12*, p. 10. Detective Barzee concluded that the images constituted "sexually exploitative material because N.B. was under the age of sixteen [sic]." *Id*., p. 128.

The 269 images were recovered from the SD card using the programs "Cellbrite," and "Zippy Reporting Tool" (ZRT). *State's Lodging A-7*, p. 1594; *see State's Trial Exhibit 91 (Cellbrite report), referenced in State's Lodging A-7*, p. 15. Detective Lukasik explained that when data is deleted from an electronic device, it is not "erased" until it is overwritten by new data. Once overwritten, the old data is replaced and is irretrievable. *State's Lodging A-7*, pp. 1273, 1279-81. He explained how to use an "Nv5 hash value" verification of the

image at the beginning and the end of the examination to make sure that the nothing had changed during the examination. *Id*., pp. 1618-1619, 2030.

Detective Lukasik explained that he also used a program called "IrfanView" to extract EXIF ("exchangeable image file") information from the digital photographs. *Id*., pp. 1351-1352. EXIF is information about a camera that is embedded into a photograph, such as the type of camera and the shutter speed. *Id*., pp. 1350-1351.

Detective Lukasik found the sexually exploitative images on the SanDisk memory card inside Petitioner's camera. *Id*., p. 803, 1312-1314, 2072, 2156; *see Trial Exhibit 152*. The examination of the SD card was made on February 8, 2011; the internal memory of the camera (which needed an external cable) was examined on February 22, 2011. *State's Lodging A-7*, pp. 1329, 1322. No nude photos were found on Petitioner's camera's internal memory. *Id*., p. 717.

When Detective Lukasik finished his forensic examination, he put the SD card back into Petitioner's camera, and the camera back into his evidence locker. *Id*., p. 1335. He prepared a forensic report with photographs. At trial, Detective Lukasik testified that the exploitative photos had come from the SD card in Petitioner's camera, had been deleted by someone, had been restored by the Cellbrite program, and did correspond with the dates of the charged crimes. *See State's Lodging A-7*.

After N.B. disclosed that Petitioner had taken photographs of her at "Bud's house," *see State's Lodging A-7*, p. 346, detectives served a search warrant on Jack "Bud" Omohundro and retrieved Omohundro's personal camera, which was the same model as Petitioner's camera. The Omohundro camera had a different serial number

(7385C90ZA17027J) than Petitioner's camera (BI1026516095D). Compare Dkt. 49-11, p. 2 with *State's Lodging B-1*, p. 299.

Analysis revealed that Omohundro had images of N.B. clothed and in red underwear. *State's Lodging A-7*, pp. 1836, 1855. He also had pornographic photographs of adult women. *State's Lodging A-9*, p. 42. The investigator found that photoshopping edits had been made on the adult women's photos on "the Omohundro CD," but none of the edited photos were of N.B. *Id.*, pp. 2155-2156.

At trial, Omohundro testified that he met N.B. at the Oasis Bar on Halloween 2010, where she was with Petitioner. *State's Lodging A-7*, p. 1211. Omohundro testified that he saw Petitioner take photos of N.B. at Omohundro's house. *Id.*, p. 1213. He testified that his "landlady is an exotic dancer" who had installed what N.B. called a "stripper pole" in the bedroom before renting it to him. *Id.*, pp. 271, 1313.

### 2. The Two Different Cases against Petitioner and Petitioner's Legal Representation during Trial

In Criminal Case CR-2011-692, filed on January 18, 2011, prosecutors charged Petitioner with seven counts of battery of a child, arising between October 1, 2010, and January 9, 2011, and one count of kidnaping (not for ransom), from January 9, 2011. *See State's Lodging A-1*.

During the pendency of the first case, prosecutors brought a second separate criminal case against Petitioner, CR-2011-8021, on July 26, 2011. That action charged

twelve counts of use of a child in sexually exploitative[3] material, and two counts of sexual battery by making sexually exploitative photographs of a minor child, all arising from a different date (January 18, 2011) than the charges in the first action. When the second action was originally filed, it had no charges in common with the charges in the first case. *See State's Lodging A-3, pp. 68-74.*

In the first case, four successive attorneys were appointed to represent Petitioner. All withdrew. Petitioner reports that, first, Sam Beus withdrew because of a conflict of interest; second, Loren Bingham withdrew on "religious" grounds; third, Tim Williams withdrew because of a potential conflict of interest. Dkt. 49, pp. 39-41. Petitioner filed a letter of complaint with the Idaho Bar Association against his fourth attorney, Joe Rockstahl, who then withdrew on the basis of a breakdown of the attorney-client relationship. *State's Lodging A-6*, pp. 224-226.

When the fifth attorney, David Haley, was appointed, Petitioner refused to waive his speedy trial rights to allow Haley to get up to speed on the case. On September 2, 2011, with the first case having been pending nine months, the state stipulated that Petitioner had been prejudiced by the delay and agreed to dismiss the charges. After some discussion, Mr. Haley and the prosecutor agreed that the court would dismiss the charges without prejudice. *State's Lodging A-1.*

On September 8, 2011, the prosecutor filed an amended information in the second

---

[3] The charging informations use the term "exploitive," while the statute uses "exploitative." The state district court pointed that out to the parties during the course of proceedings, and the difference is not material to the Court's decision here.

MEMORANDUM DECISION AND ORDER - 8

action, adding in some of the first action's charges that had been dismissed without prejudice. *State's Lodging A-3*, pp. 117-125. The amended information contained 16 charges in total. The information was amended several additional times. Eventually, Petitioner was tried on 15 charges: eight counts of possession of material sexually exploiting a child, one count of sexual battery of a child by taking sexually exploitative photographs of a child, and six counts of sexual battery by having lewd and lascivious contact with a child.

During the new case, Mr. Haley, Petitioner's fifth attorney, withdrew "based on differences in opinion between counsel and defendant as to the integrity of the local judicial system itself, together with differences in opinion as to preliminary hearing and trial strategy, which have or in all likelihood will lead to breakdown in the attorney-client relationship." *State's Lodgings A-3*, p. 109; *A-6*, p. 225.

After that, a sixth attorney, Dan Brown, was appointed to represent Petitioner. On March 5, 2012, the day of the scheduled jury trial, the court heard Petitioner's pretrial motions in Courtroom 3, because the jury was seated in Courtroom 1. At that time, Petitioner asked to represent himself for the following reasons, as articulated by Mr. Brown: "The reason he wishes to represent himself is because he is knowledgeable as to my role as his attorney; and, therefore, I make the decisions as his attorney; and therefore, I make the decisions as to the witnesses to be called and the questions to be asked and that it is Mr. Brackett's desire apparently to call his own witnesses and ask his own questions." *State's Lodging A-5*, p. 220. Petitioner agreed to keep Mr. Brown on as stand-by counsel.

MEMORANDUM DECISION AND ORDER - 9

In this midst of these problems over representation, on March 27, 2012, during a bond reduction hearing, Petitioner notified the court that his former roommate had died.

The court asked Petitioner what he anticipated as to the jurors waiting to go to trial that morning. "Is it your request to proceed immediately this morning, or are you requesting a continuance of the court in this case?" *Id*., p. 221. Petitioner replied: "I need to overlook some evidence that's been delayed on my viewing. So, yes, I would ask for a continuance, Your Honor." *Id*. The court continue the trial until October 29, 2012, to permit Petitioner adequate time to prepare to represent himself at trial.

On July 20, 2012, Petitioner asked to have Mr. Brown withdrawn as stand-by counsel, because Petitioner said there was huge lack of communication and Mr. Brown was too busy to work on his case. Mr. Brown confirmed that Petitioner told him Mr. Brown wasn't acting in his best interest. Mr. Brown completely disagreed, but said the allegations had caused the attorney-client relationship or the communication between them to be broken down. *State's Lodgings A-3*, pp. 1160-1163. Mr. Brown said: "Defendant has made repeated accusations towards your Affiant's office that we are somehow involved in a conspiracy against him." *Id., p. 1163*.

### 3. Disclosure and Discovery of Evidence During Trial

Evidentiary issues were complicated by Petitioner's pretrial detainee and pro se status and limitations imposed by Idaho's "Rape Shield Act" and the state counterpart to Adam Walsh Child and Protection Safety Act of 2006,[4] Idaho Criminal Rule 16(m), which

---

[4] Pub. L. 109–248, §§ 1–707, (H.R. 4472), 120 Stat. 587.

provides that "sexually exploitive material must remain in the care, custody, and control of the court or a law enforcement agency and that a court shall deny any request to reproduce any sexually exploitative material," so long as it is made reasonably available to the defendant. *State's Lodging A-12*, p. 12. Idaho Criminal Rule 16(m)(3) states that evidence shall be deemed to be reasonably available if the State provides "ampl[e] opportunity for inspection, viewing, and examination of the property by the defendant, defense counsel, and any individual the defendant may seek to qualify to furnish expert testimony at trial." To comply with Rule 16(m), the trial court provided Petitioner with an opportunity to access the evidence at the courthouse.

As to access to the *original* electronic evidence, prior to the first trial Petitioner sought and was granted access, as follows:

> The court GRANTS IN PART and DENIES IN PART [the Motion for Order for Defendant to View and Examine Original Devices Samsung Camera, San Disk Memory Card and Nikon Camera and Plaintiff[']s phone with Micro SD card with and in the presence of Defense Expert Chris Pavan and Order for Transport, filed June 12, 2012]. The defendant may inspect the original devises [sic] with his expert. However, this court will not order that the devices and the defendant be transported to another location. The defendant and his expert must coordinate with the county jail and agents for the state to establish a protocol for such a view. Therefore, the portion requesting that the defendant be able to view and examine the original devises [sic] with his expert is GRANTED, while his requested order to be transported is DENIED.

*State's Lodging A-3*, p. 1182.

It is clear from the record that Petitioner had a CD copy of Detective Lukasik's report, the photographs retrieved from the SD card, a CD of metadata from the forensic

MEMORANDUM DECISION AND ORDER - 11

analysis, and the Omohundro CD. *See State's Lodging A-10*, pp. 26-31. On March 27, 2012, the trial court ordered that "a computer be provided to the defendant for his use to view the discs." *State's Lodging A-3*, p. 2306. The Twin Falls County Jail arranged for Petitioner to have access to the evidentiary materials at the jail. *See State's Lodging A-8*.

In the course of Petitioner's review of the forensic report and photographs, Petitioner asserted that sequentially-numbered photographs found in the forensic examination were missing—meaning that the prosecution had "cherry-picked" and provided only those images it wanted to use in its prosecution. Julie Sturgill, the prosecutor, responded that the missing photographs were merely duplicates; she asked Detective Lukasik to produce a CD with copies of the duplicates to provide to Petitioner and Franklin Hall, petitioner's investigator, but represented that the information on the new CD would be merely duplicative. There was a dispute as to whether Petitioner already had the "duplicate" images, but the Court stated:

> Well, I think the difficulty for Mr. Brackett is, he's trying to put this case together, and he's made that choice to do so; but at the same time, to me, the effort to burn another disk is not astronomical. I would order it to be done irrespective of the distinction or disagreement between apparently what Mr. Hall is saying to the state and what Mr. Brackett is telling the court.

*State's Lodging A-5*, pp. 564-565.

Regarding access to the metadata of the photographic images, the trial court stated:

> Well, Mr. Brackett, the court stands behind your ability to prepare your defense and access this information. I guess, in terms of manpower issues for the bailiffs and the court security officers, if there is a way to facilitate this to where it could be done in some conference room in the criminal justice facility, I don't think Ms. Sturgill [the prosecutor] or I or anyone else

MEMORANDUM DECISION AND ORDER - 12

> stands in the way of that. I think we can be proactive. But until there's some other means, Mr. Brackett has access to the courthouse and the information.
>
> Prepare an order, please, that allows you access to the material. The only reason I made the statement about trying to work out something less intrusive, perhaps then you aren't having to be brought up in cuffs and that kind of thing. I don't know what exists. Bruce, I don't know if there is anything available. I just state that, if there's a way to make it easier for both sides, great. If not, then the method you've used is what you have, and you will have to figure out a way to make it happen, for you to be able to access the information. It's impossible for us to know, just looking at these numbers, what relevance they have to you. You know that. You represent you need more time. You get it.

*State's Lodging A-5*, pp. 511-513.

The state court record reflects that the trial court went to great lengths to determine whether Petitioner had access to all of the evidence he said he needed. The Court finds that the following characterization of the record by the State is an accurate summary:

> On August 16, 2012, approximately two and a half months prior to his first trial, Brackett filed a motion to compel a "copy of all non-sensitive images, files, video[s], audio from devices imaged by state expert witness Don Lukasik from the IWRCFL to include all EXIF, JPEG information." In a subsequent order, the district court noted that, "[t]he body of [Brackett's] motion provides no more information on the actual request but does request that the information be provided to the defendant's investigator so that it can be taken to the jail." The court then continued that while it would permit a hearing on the motion, it was "incumbent upon the defendant to identify specifically (1) what materials he believes have yet to [be] provided by the state to him and (2) in what format he wishes to receive those materials. Only then can the court consider granting the defendant's motion."
>
> A hearing on Brackett's motion was conducted on August 22, 2012. At the hearing, Brackett asserted that he had not yet been provided the "exact reports" that Detective Lukasik imaged

from the SD card that was recovered from the seized Samsung camera. Brackett [responded]:

> I have now three different devices that have contained three – there's different things on each different disk. There's something different on this disk. Something different on this disk. I have a zip drive that was e-mailed to one of the expert witnesses for the defense, directly from Lukasik; and that zip drive itself contains no images, just the image number and the metadata. It has way more images than should be on those disks and stuff that are [sic] missing; and that's in the possession of my investigator. And I'm just not understanding why I can't get the exact copy of everything that Don Lukasik did and why can't my investigator speak with him.

In response, the state discussed its disclosures relating to one of the exhibits specifically referenced by Brackett, "state's exhibit 30" from the preliminary hearing. This exhibit was a "DC disk containing [a] copy of images retrieved by Mr. [Lukasik] from the Samsung digital camera."

The state explained that it had previously disclosed and provided to Brackett an "exact copy" of this exhibit. However, while this copy contained all of the metadata associated with the images, it did not include all of the EXIF information that is embedded into the images. Because Brackett had requested access to this EXIF information, the state separately disclosed and provided that information to Brackett. On this disclosure of EXIF data, the state "blacked out the pictures" that were associated with the data. However, between the various formats of disclosure, the state told the court that Bracket "has one way to get [the EXIF information] in one, and then another with all the metadata." With respect to these edits, it appears that the state was concerned about the I.C.R. 16(m) prohibition against copying sexually explicit images.

The state further explained that it had made these copies and disclosed and provided this additional EXIF information in the hope that it would facilitate Brackett's trial preparation, in light of the fact that Bracket had limited access to his investigator and/or computer at the jail where he was

incarcerated. Ultimately, the prosecutor represented to the court it was not aware of any discoverable information Brackett lacked with regard to his requests, and that Detective Lukasik had told her that "what is on the [disclosed] report is everything."

The district court then expressed a desire to hear testimony from Detective Lukasik, to have him "come [to court] with everything he has, duces tecum essentially, to that hearing," so that the court could "get this out on the record because who am I to believe what's there"? The state also expressed a willingness to set up a conference call with Brackett's investigator and Detective Lukasik to attempt to determine what disclosures Brackett felt he still lacked. The state also requested a copy of the zip drive disclosure that Detective Lukasik provided directly to Brackett's expert so that it could attempt to determine what, if anything, Brackett might be lacking. In response, Brackett stated that he "[didn't] want to get [himself] into an evidentiary hearing at this moment," and that he wanted to save such factual development for his jury trial. The district court replied, that "if I'm going to grant any relief to you, I have to know what he has and hasn't given to you."

Rather than accept the offers of the court and the state to help facilitate the factual development of his discovery requests, Brackett instead elicited testimony from Franklin Hall, his investigator. Hall testified that with regard to the disclosures provided by the state, "[t]here definitely appears to be some inconsistencies, and instead explained that he was "far from an expert."

At the conclusion of the hearing, the district court denied both Brackett's motion to compel, and the state's request to obtain a copy of the zip drive possessed by Brackett:

I'm not, as I've said already, here to make findings about what has or hasn't been done with any evidence. I'm left with the state telling me they have given everything they have. Mr. Brackett has a zip drive that apparently the state doesn't have.

So I will decline the request, Ms. Sturgill, at this time and indicate that you should be able to get [the information on the zip drive] through [Detective Lukasik], the same thing that he sent to [Brackett's appointed expert] by e-mail, just a copy of the e-mail.

As to your requests, Mr. Brackett, I'm going to also deny them, finding at this point you have more than the state has.

If you can come forward and say this, and this is what I need, that I don't have and identify it, I'm happy to order that; but at this point, I'm just in a no man's land.

I will also authorize under Rule 15 of the Criminal Rules a deposition of Lukasik, if you want to do that, wherein a deposition could be taken duces tecum. I will certainly grant you a hearing where he would be required to appear in the court or by telephone to also inquire in these matters with the court present to rule on any objections. So those options are available to you upon your request.

The deposition is taken like a civil deposition. The court's not present. A court reporter would be. Counsel for the state would be, and that would essentially potentially work into creating a record on the discovery resolution process, so I make that aware to you [sic] and available to you.

But, other than that, it seems to me that I have not a sufficient record to say one way or another what has yet to be produced. And if Mr. Lukasik comes to a deposition or to court with his entire file, has it available to you, then perhaps we can mete out what from there is missing that you still need. I'm not trying to stand in your way. I just have to know that there are things there that need to be ordered; and at this point I have no way of doing that.

In response to the court's order and offer to authorize a deposition, Brackett stated that he did not want to conduct a deposition of Detective Lukasik. The district court replied that

MEMORANDUM DECISION AND ORDER - 16

it was up to Brackett and his investigator to pursue his available avenues, and noted that the dilemma Brackett faced in attempting to facilitate his goals in discovery was based upon his own decision to represent himself in a case this complex.

*State's Lodging A-10*, pp. 26-31 (internal record citations omitted).

### 4. Petitioner's Expert Witness Difficulties

The Idaho Court of Appeals outlines the history of Petitioner's expert witness requests, appointments, and denials as follows:

> In December 2011, the district court appointed an independent district judge or "money judge" to conduct ex parte reviews of Brackett's requests for funding to support expert and investigative assistance…. On December 13, 2011, the money judge ordered Brackett to support requests with two documents: (1) a motion which described the need for the funds, the requested expert's credentials, how travel and other expenses would be measured and billed, and a certification that the expenditure of public funds was appropriate to make available necessary services and facilities of representation; and (2) an accompanying affidavit which contained a specific estimate of the amount of public funds to be expended, a certification that Brackett had pursued the available market for experts, that the requested expert provided the most economic service available in his or her field, and a certification that the expert would provide bills on a monthly basis.
>
> In April 2012, Brackett filed a motion requesting public funds to support expert assistance from a computer forensic expert in California [Chris Pavan]. The money judge authorized Brackett to retain the expert for the upcoming trial and approved funding in the amount of $3,000. In August 2012, Brackett, citing jail phone restrictions [that obstructed communication with Pavan], filed a motion requesting the appointment of a second expert [Mark McLaughlin] to replace the first as his forensic expert. The money judge issued an order authorizing Brackett to retain the second expert and approved additional funding in the amount of $5,000. Later that month, at a hearing, Brackett told the money judge that the second expert had done "absolutely nothing" on the case and requested

MEMORANDUM DECISION AND ORDER - 17

that the second expert not be paid. Brackett requested that the money judge appoint a third forensic expert.

Before the money judge could rule on Brackett's new request, the second expert sent a letter to the court disputing Brackett's characterization of the expert's services. The second expert attached a detailed billing invoice which he had previously submitted to the court. This invoice indicated that the second expert had communicated with Brackett's investigator and had obtained and reviewed the defense casefile provided to him by Brackett's first expert. In the accompanying letter, the second expert stated that he had engaged in numerous and extensive telephone conversations with Brackett, but that Brackett repeatedly requested that the second expert travel to Twin Falls immediately to speak with him—an activity that the second expert did not believe would be an efficient use of his resources. The second expert also reported that he had requested relevant Idaho law enforcement authorities to provide "original items of digital evidence for [his] examination," but it was his understanding that Brackett, through his investigator, stopped the investigator's request to have copies of the original evidence transferred for examination. As a result, the second expert stated he had not yet had the opportunity to review the copies of the original digital evidence. However, the second expert explained that he still planned (assuming adequate funding to support an additional forty to sixty hours of billable time) to examine the original evidence, travel to Twin Falls to meet with Brackett, provide Brackett with the results of the examination, write a detailed report about the expert's findings, help prepare Brackett for trial, and request that the court allow him to sit alongside Brackett in presenting his defense. For the remainder of the proceedings in the underlying case, it appears that Brackett made no additional requests for funding for the second expert to complete this work.

On September 5, 2012, the money judge denied Brackett's motions to appoint and fund Brackett's third requested expert. The money judge noted that it was unclear what the second expert was or was not directed to do by Brackett or his investigator. The money judge then concluded in light of the services already provided by the second expert and his willingness and apparent ability to perform additional services,

Brackett had failed to make an adequate factual showing for additional funds to retain a new expert. Approximately one week later, Brackett submitted an unsworn affidavit, again requesting that the third expert be funded and appointed to assist his defense. The money judge denied the request. The money judge concluded that, based upon its review, the services completed by the second expert were reasonable. The money judge further held there was no showing that the second expert was unable to provide the expert assistance and services required by Brackett or was otherwise unqualified and that, although Brackett "may have an unsubstantiated lack of confidence" in the second expert, it was "not a legitimate basis to appoint yet another expert." The money judge also noted that it would likely approve additional funding requests for the second expert to continue his work in this case, provided such requests complied with the December 13, 2011, order. At approximately the same time, the second expert sent a sealed declaration to the district court requesting additional funds and stating that he had completed some additional work on Brackett's case for which the money judge had not yet approved funding. The second expert also informed the district court that Brackett no longer wanted him to work on the case. In a subsequent order responding to the second expert's declaration, the money judge reiterated that the second expert remained the appointed expert for Brackett but was not authorized to perform any services on Brackett's behalf until Brackett filed a properly supported motion for funding for those services.

Despite the money judge's invitation to Brackett to request more funding for the second expert, and despite the judge's indication that approval of those requests was likely, Brackett continued to request that new experts be appointed. Between September 26, 2012, and November 8, 2012, Brackett filed several additional motions requesting that a third expert be appointed to replace the second expert. The money judge denied all of the motions, noting that Brackett had repeatedly failed to comply with the December 13, 2011, order governing the requests and had failed to support his repeated motions with new or additional information.

Finally, on November 13, 2012, based on Brackett's continued failure to comply with the order entered on December 13,

2011; the previously authorized funds for an investigator to assist in Brackett's defense; Brackett's choice not to utilize the digital expert appointed; and there having been no further showing of the need and necessity for further services of an investigator or expert, the money judge ordered:

> 1. The appoint[ment] of [Brackett's] investigator at county expense hereby TERMINATED and this court will not consider any further request for the investigator at county expense;

> 2. The appointment of a new Digital Expert is hereby DENIED and this court will not consider any further application for public funds for an expert;

> 3. The further request of [Brackett's investigator] for payment of investigative services that exceeded the authorization of this court is DENIED.

*State's Lodging A-12*, pp. 14-17; *see State's Lodging A-3*, pp. 283-287.

### 5. Petitioner's First Trial, Transfer to a Different Jail, and Denial to Re-Examine Evidence in Preparation for Second Trial

Petitioner's first trial ended in a mistrial when, during his opening statement, Petitioner violated several pretrial orders regarding content that was not to be presented to the jury. *State's Lodging A-8*, pp. 24-35. Petitioner had between October 2012 and January 2013 to prepare for the second trial.

Petitioner was transferred to a different jail prior to the second trial, and access to any of the State's evidence was not offered at the new jail. In between the first and second trials, on November 15, 2012, Petitioner moved for an order transferring evidence under seal—specifically "Exhibit 30 Cd #1 and CD #2 also item #23 the Omohundro disk"—kept in Twin Falls County Court House to Blaine County Court House. On the same day, he filed a motion to allow access to the original cameras and SD card in a separate motion.

MEMORANDUM DECISION AND ORDER - 20

*State's Lodging A-3*, p. 1767-1770. Petitioner again requested access to the original evidence in a motion filed January 9, 2013. *State's Lodging A-3*, p 2274.

Because of the sensitive nature of the evidence, the district court decided to deny Petitioner further access to the evidence during the three months between the mistrial and the second trial. *See State's Lodging A-8*. The court reasoned that Petitioner "has not provided any statute, procedural rule, or case law that would require the court to permit the Defendant's continued access to the evidence at issue where the case was ready to proceed with trial but was only continued to a new date due to misconduct on the part of the Defendant." *State's Lodging A-3*, p. 2371.

Petitioner maintains that he was *never* provided with access to the original or the detective's copy of the SD card. However, he does not contest that the record reflects that the state district court ordered access to the original SD card for himself and his expert. Petitioner simply did not take advantage of that order after the first expert withdrew and he decided not to use the second expert.

### 6.  Petitioner' Second Trial

Functioning as his own attorney at the second trial, Petitioner attempted to show both that he did not have a relationship with N.B. *and* that he did not know N.B. was under the age of 18 (which is not relevant if he did not have a relationship with her). He also attempted to show that detectives "fabricated, manipulate[d] and/or altered" digital evidence to frame him. *State's Lodging A-3*, p. 2283. Petitioner focused on the discrepancies in the electronic metadata as part of his defense that the photographs were fabricated. By cross-examining Detective Lukasik, Petitioner pointed out that there were

gaps in the numerical system of the photos recovered, which means certain photographs could have been purposely erased. *See State's Lodging A-7*, pp. 20036-2038. Petitioner also asserted that Detective Barzee manipulated his text messages. *Id*., pp. 940, 2860-2861. Petitioner argued in closing that N.B. had been "coerced" and "brainwashed" by the prosecutor. *Id*., p. 2878.

After the three-week-long second trial, the jury found Petitioner guilty of eight counts of possession of sexually exploitative materials and five counts of sexual battery on a minor child of sixteen or seventeen. *State's Lodging A-12*, pp. 1-2. The State dismissed one count during jury instruction discussions, and the jury was undecided on one sexual battery count. *State's Lodging A-7*, pp. 699, 2922.

### 7.  Appeals

Petitioner's conviction was affirmed on direct appeal, and his post-conviction petition was denied, with the denial affirmed on appeal. See Dkt. 2 at 2-3; *State's Lodgings A-12* to *A-18* and *D-6* to *D-9*. Petitioner filed several motions for a new trial, all of which were denied, with the denials affirmed on appeal by the Idaho Court of Appeals. *See State's Lodgings B-1* to *B-9*, *C-1* to *C-6*, and *E-1* to *E-8*. The Idaho Supreme Court denied the petitions for review. In all, the Idaho appellate courts have reviewed Petitioner's case six times.

### 8.  Petitioner's Federal Habeas Corpus Claims

Petitioner has come to federal court under Title 28 U.S.C. § 2254 to test the findings and conclusions of the state courts. In this action, Petitioner brings six claims in his Amended Petition: (1) the trial court violated his federal constitutional right to a speedy

trial; (2) the trial court violated his constitutional double jeopardy rights by granting, over his objection, a mistrial following his violation of numerous court orders during his opening statement; (3) the trial court violated his due process rights by: (a) denying his request for inspection of the original or an exact copy of the SD card that investigators said contained nude photographs of the victim that had been deleted from a camera found in Petitioner's home, and (b) denying his request to access the forensic and electronic evidence during the time period in between the two trials (the court reasoned that Petitioner had been prepared for the first trial and had caused the mistrial, and thus he was already prepared for the second trial); (4) the "money judge" appointed to consider Petitioner's requests for funding for investigative and expert services violated Petitioner's constitutional rights by limiting his requests for additional funding; (5) cumulative error; and (6) Idaho Code § 18-1508A (sexual battery of a minor) unconstitutionally precluded him from presenting a complete defense. Dkt. 28.

Respondent asserts that Claim 6 is subject to denial on procedural default grounds, as well as on the merits, and that Claims 1 through 5 are subject to denial on the merits. The Court will first address Petitioner's general allegations, then the procedural default issue, and finally the merits of the claims.

## PETITIONER'S ARGUMENTS NOT REFERABLE TO SPECIFIC CLAIMS

Petitioner makes several arguments in his Reply that are not referable to any particular claim but are intended to support Petitioner's general theory that the State is engaging in a "continued manipulation of facts and truth to mislead courts for [an] advantage." Dkt. 49, p. 1. The Court rejects these arguments either as additional stand-

alone claims or as support for the claims in the Amended Petition, but it will address only some of them here for purposes of judicial efficiency. All of these generalized arguments are rejected, regardless of whether they are specifically addressed in this Order.

### 1.  Credibility of Complaining Witness

Petitioner argues that the complaining witness, N.B., told authorities multiple times that nothing sexual happened between her and Petitioner. N.B. admitted at trial that, when authorities first questioned her at school, she said nothing happened, because Petitioner had told her to respond in that manner, and she thought the whole inquiry would go away if she said nothing happened. *State's Lodging A-7*, pp. 319-320. When it became clear that authorities were going to continue to question her, she decided to tell the truth. *Id*. She then revealed the relationship that formed the basis of Petitioner's criminal charges and convictions.

Petitioner cross-examined N.B. at trial and had adequate opportunity to probe which version of the facts was true. Petitioner asked N.B. at trial, "And, once again, it's your testimony that no false accusations have ever been made by you?" N.B. responded, "Yeah." Petitioner said, "Excuse me?" N.B. replied, "I've never made any accusations." *State's Lodging A-7*, pp. 341-342. N.B. clarified she may have said she didn't want the prosecution to happen, because she just wanted to forget about the relationship and move on, but she never said that the allegations were false. *State's Lodging A-7*, p. 423. N.B. testified that she told Idaho Department of Health and Welfare officials that "there was nothing of a relationship on," and that "[she] and Mr. Brackett were just friends," because "Mr. Brackett had told me numerous times before that day that if anybody were to ask, I were to deny it

[sic]" *Id*., p. 454.

The jury heard both N.B. and Detective Nunally testify that N.B. denied that anything happened two or three times when originally confronted about whether she was having a relationship with Petitioner, before changing her story. This is not an instance where important information was withheld from the jury. Petitioner is not bringing forward new evidence that was *not* considered by the factfinder. The jury was the fact finder charged with judging the credibility of N.B. and Petitioner, and, clearly, it decided that question in favor of N.B. after Petitioner cross-examined her on this topic.

Petitioner further argues that prosecutor Julie Sturgill met with N.B. over 50 times to ensure that she would tell a false story at trial. The jury heard N.B. admit that she met with the prosecutor "quite a few times," and that it could have been "50 to 60 times." *State's Lodging A-7*, pp. 327-328. N.B. testified on cross-examination that the meetings were to prepare her for "what was going to happen," and that the prosecutors told her only to "get up [t]here and tell the truth." *Id*., p. 328. Again, the jury obviously decided this factual controversy in favor of N.B.

The United States Supreme Court has cautioned that Title 28 U.S.C. § 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor was observed by the [factfinder], but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Accordingly, this Court will not revisit the credibility issue here.

Petitioner's proffer of an affidavit of Timothy J. Miner, an acquaintance of N.B., can do nothing to tip the balance of credibility already decided by the jury. In 2015, in support of Petitioner's second motion for a new trial, Mr. Miner came forward to say that

N.B. said that prosecutor Julie Sturgill told her that if her story changed again, Ms. Sturgill would put her in prison for perjury and contempt of court. Ms. Sturgill also allegedly told N.B. that she "should just take the money for her and her family and just walk away." *See* Dkt. 49-1, pp. 2-3 (Declaration of Timothy J. Miner, dated September 22, 2015). The Idaho Court of Appeals evaluated the merits of the Miner affidavit on appeal of the denial of his second new trial motion and agreed with the state district court's opinion that the affidavit contained inadmissible hearsay, and that Petitioner did not argue that any hearsay exception would apply to render it admissible. *State's Lodging B-6*, p. 4.

Petitioner asserts that the Miner affidavit supports his contention that the prosecutor was carrying on a "scam": first, the prosecutor would send $5,000 to $10,000 to a counseling service, which is "the state's business partner"; second, the victim was advised to "attend one class" and then quit; and third, the money would be "refunded" to the victim (not the county), "minus a small fee (their cut) for the one class [the victim] attended." Dkt. 49, pp. 75-76. Petitioner did not present this argument in the state district court, nor does he present any admissible evidence that these allegations are true. Petitioner said that he asked his post-conviction attorney to subpoena Julie Sturgill to a hearing to ask her about this scam, but his attorney, Mr. Dunlap, said, "Ms. Sturgill will not be subpoenaed." *See* Dkt. 49, p. 78. Petitioner has not brought forward any admissible evidence to date of the existence of such a conspiracy, such as payment records or a pattern of victim counseling dropouts. It is not unreasonable for an attorney not to subpoena a prosecutor to a hearing to discuss a highly unusual accusation without having some factual basis to show that the conspiracy exists. The Miner affidavit is inadmissible hearsay, and Petitioner's allegations

of a prosecution/victim counseling scheme have no factual support.

### 2. Conflict of Interest of One of Petitioner's Trial Attorneys

Petitioner also asserts that Dan Brown, the attorney appointed to represent him from the public defender's office at the start of the second trial, had a conflict of interest. Brown's representation of Petitioner overlapped for the first few months with his representation of a man named Senad Cerimovic, who was separately charged with misdemeanor crimes regarding a completely different incident involving the same victim, N.B., in June 2011. *See State's Lodging B-1*, p. 237. Mr. Cerimovic pleaded guilty and was sentenced on November 14, 2011. *See id.*, p. 238. By June 2011, Petitioner had already been incarcerated for six months; he remained imprisoned well beyond Cerimovic's guilty plea in November 2011.

On November 29, 2011, Petitioner told the trial court he thought Mr. Cerimovic fathered N.B.'s child and, therefore, Mr. Brown's concurrent representation of Mr. Cerimovic and Petitioner was a conflict of interest. *State's Lodging A-5*, pp. 115-122. Mr. Brown told the Court that his representation of Mr. Cerimovic was completed by that date, but that Mr. Brown still might be listed as attorney of record in that case. *Id.*, p. 121. Mr. Brown said that the *potential* for a conflict existed unless the Court decided that the Idaho Rape Shield Act prevented Petitioner from introducing evidence that Mr. Cerimovic had sexual relations with the same underaged victim. *Id.*, p. 169.

The trial court observed:

> At this juncture, I guess until I rule on the evidentiary question of whether Cerimovic's issue is even admissible—because under Idaho's rape shield statute, it is fairly limited when that

MEMORANDUM DECISION AND ORDER - 27

kind of evidence can come in—I think we need to discuss that
and hear argument and see whether this is even a real issue. If
it is, then I guess we need to revisit the issue of the conflict. I
don't see an actual conflict right now, but it potentially could
be such if my ruling is that your attorney is free to go into all
of those things.

*Id.*, pp. 122-123.

The trial court made it clear in pretrial proceedings that alternative perpetrator
evidence would be deemed inadmissible absent an offer of proof establishing the direct
connection between the alleged perpetrator and the crimes at issue. *See State's Lodgings
A-3*, p. 507 (citing Idaho Rule of Evidence 412(c)(2) (a defendant seeking to introduce
evidence regarding a sex-crime victim's past sexual behavior is required to submit a written
offer of proof from which the trial court determines if that evidence falls within the limited
exceptions for admissibility)), p. 1620; *see State's Lodging A-3* (order on State's motion in
limine). Petitioner does not argue here that he made an offer of proof at trial to have the
Cerimovic evidence admitted. *See State's Lodging A-7.*

A criminal defendant has the right to be represented by conflict-free counsel under
the Sixth Amendment. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). However, the mere
"possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*,
446 U.S. 335, 347 (1980). When a conflict is shown, prejudice is presumed only when: (1)
"the defendant demonstrates that counsel actively represented conflicting interests"; and
(2) "an actual conflict of interest adversely affected his lawyer's performance." *Burger v.
Kemp*, 483 U.S. 776, 783 (U.S. 1987)(quoting *Strickland v. Washington*, 466 U.S. 668, 692
(1984) (citation and quotations marks omitted), and citing *Cuyler*, 446 U.S. at 348). *See*

*also Mickens v. Taylor*, 535 U.S. 162, 172-73 (2002) (rejecting the proposed rule of automatic reversal of a conviction where a conflict did not affect counsel's performance).

A defendant who brings an attorney conflict-of-interest claim must "show that potential conflicts impermissibly imperil[ed] his right to a fair trial." *Cuyler*, 446 U.S. at 348 (internal citations omitted). The *Cuyler* Court provided the following example of a conflict of interest that adversely affected the defendant's trial:

> In *Glasser v. United States*, [315 U.S. 60, (1942)], for example, the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser with the crime and failed to resist the presentation of arguably inadmissible evidence. *Id*., at 72-75, 62 S.Ct. at 465-467. The Court found that both omissions resulted from counsel's desire to diminish the jury's perception of a codefendant's guilt. Indeed, the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted." *Id*., at 75, 62 S.Ct., at 467. Since this actual conflict of interest impaired Glasser's defense, the Court reversed his conviction.

446 U.S. at 348-49.

There is no indication in the record that Mr. Brown's representation of Mr. Cerimovic and his representation of Petitioner posed an *actual* conflict of interest, or that any potential conflict of interest adversely affected Mr. Brown's performance. Petitioner did not make an offer of proof regarding such evidence at trial, and he still does not state here what Mr. Cerimovic had to do with Petitioner's crimes that occurred prior to Mr. Cerimovic's crimes. Therefore, Petitioner's conflict of interest argument does not have an adequate factual basis to warrant further discussion.

### 3.  Conclusion as to Non-Referable Arguments

In summary, to the extent that Petitioner relies upon any of these general arguments

either as stand-alone claims or as a factual or a legal basis for habeas corpus relief, the Court rejects them. The Court has considered and rejects Petitioner's other arguments not specifically addressed herein, many of which are raised on habeas corpus review for the first time. *See, e.g.*, Dkt. 53, n. 1 (Respondent's Sur-Reply listing other arguments not part of the Amended Petition); Dkt. 49, p. 30 (Petitioner asserts in his Reply: "The District Court "Crabtree" declared a mistrial over the Defendants' objection. This was done to give advantage to the state as it … did not like the jury seated as the jurors were not all white as in the second trial."); *id*, p. 45 (Petitioner asserts in his Reply: The county prosecutor was forum shopping because the truly Honorable John Brody was presiding. A court much less likely to go along with the unconstitutional actions involved in this matter.")

### DISCUSSION OF CLAIM 6: PROCEDURAL DEFAULT ANALYSIS

**1.      Standard of Law Governing Dismissal**

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may move the Court to dismiss claims in a habeas corpus petition before reaching the merits of the claims. *See, e.g., White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989); Rule 4 of the Rules Governing § 2254 Cases.

**2.      Standard of Law Governing Procedural Prerequisites to Habeas Relief**

Habeas corpus law requires that a petitioner "exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). To exhaust a claim, a habeas petitioner must fairly present it as a federal claim to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unless a petitioner has exhausted his state court remedies relative to a

particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2).

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available. *O'Sullivan*, 526 U.S. at 848. A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991).

If a claim has not been properly exhausted in the state court system, the claim is considered "procedurally defaulted." *Coleman,* 501 U.S. at 731. A procedurally defaulted claim will not be heard in federal court unless the petitioner shows either that there was legitimate cause for the default and that prejudice resulted from the default, or, alternatively, that the petitioner is actually innocent and a miscarriage of justice would occur if the federal claim is not heard. *Id.*

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show "prejudice," a petitioner bears "the burden of showing not merely that the errors [in his proceeding] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

An attorney's errors that rise to the level of a violation of the Sixth Amendment

right to effective assistance of counsel may, under certain circumstances, serve as a cause to excuse the procedural default of other claims. *Murray v. Carrier*, 477 U.S. at 488. However, an allegation of ineffective assistance of counsel will serve as cause to excuse the default of other claims *only* if the ineffective assistance of counsel claim itself is not procedurally defaulted or, if defaulted, a petitioner can show cause and prejudice for that separate default. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000). In other words, before a federal court can consider ineffective assistance of trial or direct appeal counsel as cause to excuse the default of underlying habeas claims, a petitioner generally must have presented the ineffective assistance of counsel claim in a procedurally proper manner to the state courts, such as in a post-conviction relief petition, including through the level of the Idaho Supreme Court.

As to a related but different topic–errors of counsel made on post-conviction review that cause the default of other claims–the general rule on procedural default is that any errors of a defense attorney during a post-conviction action *cannot* serve as a basis for cause to excuse a petitioner's procedural default of his claims. *See Coleman v. Thompson*, 501 U.S. at 752. This rule arises from the principle that a petitioner does not have a federal constitutional right to effective assistance of counsel during state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993).

**3.     Analysis**

In Claim 6, Petitioner asserts that I.C. § 18-1508A—the Idaho sexual battery of a minor statute—violated his rights to due process and a fair trial because it precluded him

from presenting a complete defense. Dkt. 28, p. 13. Respondent asserts that Petitioner failed to properly exhaust this claim because he did not raise it on appeal. The time to properly exhaust this claim has now expired.

Petitioner asserts that his direct appeal counsel refused to raise this claim. Dkt. 28, p. 13. Attorney error on direct appeal amounting to ineffective assistance of counsel may constitute cause to excuse the procedural default of a claim. *Coleman*, 501 U.S. at, 753-754. However, "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." *Edwards*, 529 U.S. at 451. Because the direct appeal counsel claim was never properly exhausted in the state court system, it cannot serve as cause to excuse the default of Claim 6.

On post-conviction review, Petitioner raised this claim as Claim 9. *See State's Lodging D-3*, p. 3. The state district court dismissed the claim because it could or should have been brought on direct appeal. *Id.*, p. 6. Petitioner brought no argument on appeal contesting the district court's conclusion that this claim could or should have been brought on direct appeal, rather than post-conviction review. *Id.*

The Idaho Court of Appeals did not consider the merits of this claim. Instead, the court applied a clear, consistently applied, and well-established state procedural rule to reject the claim—that appellate courts will not consider claims or issues that are not supported by argument or authority. *Id.* The Court of Appeals concluded that Petitioner's I.C. § 18-1508A claim was waived. *Id.* (citing *State v. Zichko*, 923 P.2d 966, 970 (Idaho 1996), and *Powell v. Sellers*, 937 P.2d 434, 440 (Idaho App. 1997)). The *Zichko* rule constitutes an adequate and independent state ground for dismissal. Twenty years ago, the

Ninth Circuit held that this procedural rule is adequate and independent. *See Zichko v. Idaho*, 247 F.3d 1015, 1021 (9th Cir. 2001). Hence, the claim is considered procedurally defaulted here.

Petitioner has not shown that the *Coleman* procedural default exception applies. Therefore, it cannot be heard on the merits. Nevertheless, the Court is permitted to deny such a claim on the merits, if warranted, and it will do so alternatively, below.

## STANDARDS OF LAW FOR MERITS ANALYSIS

### 1.  AEDPA Deferential Review Standard

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claim is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1.     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501

U.S. 797, 804 (1991).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Though the source of clearly established federal law must come from only the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

On federal habeas corpus review, the findings of fact of the state appellate court (and the state district court findings of fact not in conflict with state appellate court findings of fact) are entitled to AEDPA deference. *See James v. Ryan,* 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision"); *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)(we look "to the last reasoned decision" resolving a claim).

Accordingly, under §2254(e)(1), this Court presumes state court findings of fact are correct, unless Petitioner shows, by clear and convincing evidence, that the findings of fact are incorrect *and* unreasonable. In *Pizzuto v. Yordy*, the Ninth Circuit reiterated the high standard for such a showing:

> Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial deference." *Id*. "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination.'" *Id*. (alterations in original) (quoting *Wood*, 558 U.S. at 301, 130 S.Ct. 841).

947 F.3d at 530.

## 2. De Novo Review Standard

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable,

the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### 3. Harmless Error Standard

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if he "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted).

## DISCUSSION OF MERITS OF CLAIMS 1-6

### 1. Claim 1

Petitioner's first claim is that his federal constitutional right to a speedy trial was violated between the date the first case began (January 14, 2011) and the date the second case went to trial (January 29, 2013).

### A. Standard of Law

The Sixth Amendment to the Constitution of the United States guarantees the right to a speedy criminal trial. Because the speedy trial right requires a very case-specific

analysis, it has been described as "amorphous," "slippery," *Barker v. Wingo*, 407 U.S. 514, 522 (1972), and "necessarily relative." *Beavers v. Haubert*, 198 U.S. 77, 87 (1905)). In its determination, a court reviews four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his or her right to a speedy trial; and (4) the prejudice occasioned by the delay. *Barker*, 407 U.S. at 530.

The first factor, length of delay, is a threshold showing "dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (quoting *Barker*, 407 U.S. at 530-32). As to the fourth factor, prejudice from "'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence" is a serious concern "'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Id.*, 505 U.S. at 654 (citing *Barker*, 407 U.S. at 532). "[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim," and the importance of the fourth factor "increases with the length of delay." *Id.*, 505 U.S. at 655-56.

Under *Barker*, "different weights should be assigned to different reasons" for the delay. 407 U.S. at 531. "In applying *Barker*, the Supreme Court has asked 'whether the government or the criminal defendant is more to blame for th[e] delay.'" *Doggett*, 505 U.S. at 651. A prosecutor's "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State]." *Barker*, 407 U.S. at 531. Similarly, "a defendant's deliberate attempt to disrupt proceedings [should] be weighted heavily against the defendant." *Vermont v. Brillon*, 556 U.S. 81, 93–94 (2009). For example, where "no speedy-trial issue would have arisen" without a defendant's "deliberate efforts to force the

MEMORANDUM DECISION AND ORDER - 38

withdrawal of [defense counsel]," the court's analysis should factor in a defendant's "disruptive behavior in the overall balance." *Id.*, pp. 91-94.

Finally, in *United States v. MacDonald*, 456 U.S. 1 (1982), the Supreme Court emphasized the narrow primary purpose of the right to a speedy trial:

> The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*Id.* at 8–9.

Where the length of trial delay is "extraordinary," and "the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Doggett*, 505 U.S. at 657-58 (ruling that an 8.5 year delay was presumptively prejudicial, even where the defendant was not even aware of the charges during that time frame)(internal citations omitted).

### B.  State Court Decision

The Idaho Court of Appeals conducted a balancing analysis on Petitioner's speedy trial claim:

> In this case, three of the four *Barke*r factors—length of delay, assertion of speedy trial right, and prejudice—weigh in Brackett's favor in proving his speedy trial right was violated. On the other hand, one factor—the reason for the delay— weighs heavily against Brackett. Few would disagree that twenty-four months is a lengthy time awaiting trial. In addition, few would deny that the death of a potential defense witness is

a serious prejudice. Both of these factors weigh heavily in Brackett's favor in his effort to prove that his right to a speedy trial was violated. However, the delay was largely of Brackett's own making. As outlined above, at least fifteen months of the delay is attributed to Brackett's inability to work with his appointed counsel, necessitating multiple changes in counsel and multiple continuances in order for new counsel to become acquainted with Brackett's case. That leaves a delay of between nine and ten months that is attributable to the state, which is not an unreasonable delay for a case involving sixteen felony charges. We hold that Brackett's right to a speedy trial was not violated by the long delay when much of the delay was the result of Brackett's own actions.

*Id.*, p. 7. The Idaho Supreme Court implicitly agreed with the decision by denying Petitioner's petition for review. *State's Lodging D-8*.

## C. Discussion

### i.   Sixth Amendment Analysis

In concluding that Petitioner's speedy trial rights were not violated, the Idaho Court of Appeals recognized that there was a split in authority among the nation's appellate courts as to whether to count the entire time between the date Petitioner was first charged and the date he finally went to trial, notwithstanding the fact that the charges were brought consecutively in two different actions. The Idaho Court of Appeals decided to count the entire time period. *State's Lodging A-12*, pp. 3-4. However, that position has not been adopted by the United States Supreme Court.

Pursuant to 28 U.S.C. § 2254(d)(1), this Court must rely only on United States Supreme Court precedent to assess the state court's decision. Under *MacDonald*, as soon as charges dismissed, the speedy trial clock ends. The clock begins anew when new charges are refiled. In *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978), the United States

MEMORANDUM DECISION AND ORDER - 40

Court of Appeals for the Ninth Circuit explained:

> After the dismissal Arnold was no longer "accused"; he no longer had any right to demand a speedy trial under the Sixth Amendment. Any contention that he was prejudiced by delay between this dismissal and his second trial must be tested under the general requirements of due process.

*Id*. at 1383.

This Court's AEDPA review is focused on determining only whether the outcome—not necessarily the method leading to the outcome—comports with federal law as clearly established by the United States Supreme Court. In addition, because Petitioner has not shown by clear and convincing evidence that the relevant factual findings of the Idaho Court of Appeals are incorrect, the Court must presume that those findings are correct. *See* 28 U.S.C. § 2254(e)(1). As the Court will explain, an analysis of both the reduced period subject to a speedy trial analysis and the longer period afforded Petitioner by the Idaho Court of Appeals produces the same result: the delay *attributable to the state* is not long enough to violate Petitioner's rights.

Under *MacDonald*, the speedy trial delay period used by the Idaho Court of Appeals must be reduced by the time between the date of arrest in the first case on January 14, 2011, and the date of its dismissal on September 2, 2011. *See State's Lodging A-1* (Register of Actions of First Trial).

Petitioner would have been released from custody after dismissal of the first set of charges, but for the second separate case consisting of new charges involving the same victim but arising from a separate date. The speedy trial clock for the new case began when it was filed on July 26, 2011, and it ended when trial began, on January 29, 2013. This

MEMORANDUM DECISION AND ORDER - 41

shortened period of eighteen months still qualifies for presumptive prejudice under the first *Barker* factor.

The Idaho Court of Appeals found that the delay between July 2011 and October 2011 is attributable to Petitioner because his counsel "withdrew from representation as a result of Brackett's uncooperative behavior." *State's Lodging A-12*, p. 5. The Idaho Court of Appeals found that the five-month period from October 2011 to March 2012 is attributable to neither party. *State's Lodging A-12*, p. 5.

As noted above, on March 27, 2012, Petitioner notified the court that his former roommate had died. There is no hint in the record what this witness knew. Nevertheless, if a witness dies during the delay, the prejudice is considered obvious. *Barker*, 407 U.S. at 532.

The Idaho Court of Appeals found that the seven-month period from March 2012 to October 2012 is "largely attributable to" Petitioner, because on the day of trial, he decided to represent himself, and the trial had to be reset to allow him adequate preparation time. *Id*. In October 2012, Petitioner did represent himself at trial and violated three of the trial court's pretrial rulings in his opening statement. A mistrial was declared on the first day of trial, October 29, 2012. *State's Lodging A-8*, pp. 26-36. The trial was rescheduled to January 29, 2013. *State's Lodging A-3*, p. 2462. This resulting three-month delay is attributable to Petitioner for causing the mistrial.

In summary, of the eighteen months between the charges and the second trial, thirteen months is attributable to Petitioner. While three of the factors—length of delay, assertion of speedy trial right, and prejudice—weigh in Petitioner's favor, the remaining

factor tips the scales away from Petitioner under United States Supreme Court precedent, because a defendant cannot obtain dismissal of charges against him by causing delay and simultaneously asserting his speedy trial right. Without the delay attributable to Petitioner, there would be no federal speedy trial issue at all.

Alternatively, this Court concludes that the Idaho Court of Appeals' original analysis and denial of the claim, where it found that fifteen of the twenty-four months from January 2011 to January 2013 is attributable to Petitioner, is not an unreasonable application of *Barker*. *State's Lodging A-12*, p. 5. Nor is the decision contrary to *MacDonald*, *Doggett*, or *Brillon*. Therefore, under either formulation, habeas relief is not warranted under a Sixth Amendment speedy trial analysis.

ii.     Fourteenth Amendment Analysis

Because Petitioner was never actually released from custody when his first set of charges were dismissed, the Court concludes that Petitioner's case is better analyzed as a Fourteenth Amendment due process claim, rather than a Sixth Amendment speedy trial claim. The "general requirements of due process" call for application of a different standard. For a due process violation, Petitioner must show that the prosecutor dismissed and refiled the criminal complaint *for the purpose* of harassment, delay, or forum shopping. *See Stockwell v. State*, 573 P.2d 116, 125 (Idaho 1977); *State v. Averett*, 136 P.3d 350, 356 (Idaho Ct. App. 2006).

There is no evidence in the record to support any of these reasons. In fact, the record supports the opposite inference—it was Petitioner who caused lengthy delays and then tried to take advantage of that. The Constitution does not allow a defendant to cause a delay that,

in turn, would require that serious criminal charges against him be dismissed (and, as Petitioner argues, that should have been dismissed *with prejudice*).[5] Petitioner has not made a sufficient factual showing that the delay was intentionally caused by the State for an improper purpose.

Unlike a speedy trial analysis, before a due process violation can be found, not only must the defendant show that the delay was a deliberate device to gain an advantage over the defendant, but that dismissal and refiling caused substantial prejudice to the defendant's right to a fair trial. *Id.* To establish actual prejudice sufficient to warrant a dismissal, the defendant must show not only the loss of the witness or evidence but also demonstrate how that loss is prejudicial to him. *United States v. Marion*, 404 U.S. 307, 326 (1971). The proof of this prejudice "must be definite and not speculative." *United States v. Mays*, 549 F.2d 670, 677 (9th Cir. 1977). "The assertion that a missing witness might have been useful does not show the 'actual prejudice' required by *Marion*." *Arnold v. McCarthy*, 566 F.2d 1377, 1384 (9th Cir. 1978).

Here, Petitioner has not revealed  the content of the testimony his roommate would have provided had the roommate not died prior to the second trial. He has not shown how it would have stacked up to the testimony of Petitioner's own adult daughter—who was a "roommate" during the same time frame in which the charges arose—that that she saw the

---

[5] Petitioner argues that his attorney should have done more to have the charges dismissed with prejudice. However, the attorney acknowledged that the rules stated that dismissal without prejudice was the normal type of dismissal and that no case law supported his client's view that a "with prejudice" dismissal was warranted. Because much of the delay was attributable to Petitioner, the record does not support a conclusion that the trial court would have dismissed the charges with prejudice had Petitioner's attorney made that argument.

couple holding hands, that she saw N.B. kiss Petitioner on the lips, and that N.B. slept in Petitioner's bedroom. *State's Lodging A-7*, pp. 2559-2561. Comparing "the gravity of the actual prejudice shown" to "the reasons for the delay," *Arnold*, 566 F.2d at 1383 (relying on *United States v. Lovasco*, 431 U.S. at 789 (1977)), this Court concludes that the scales tip strongly against Petitioner. Because Petitioner has not met the standard for de novo review of a due process claim according to the standards set forth above, Claim 1 is alternatively denied as a Fourteenth Amendment due process claim.

### 2. Claim 2

Claim 2 is that the trial court violated Petitioner's Fifth Amendment double jeopardy rights by granting, over his objection, a mistrial following his violation of court orders during his opening statement. Respondent accurately characterizes the events leading to declaration of a mistrial in Petitioner's first trial as follows:

> In his opening statement at the first trial, Brackett violated at least three of these pretrial court directives. (State's lodging A-8, 10/29/12 Tr., pp.20-26.) Brackett told the jury that he was facing a potential "eight life sentences." (*Id.*, p.25.) He also suggested that the prosecutor would coerce witnesses to lie in exchange for some benefit. (*Id.*, pp.24-25.) Finally, he implied that N.B. possessed a fake ID and frequented bars. (Id. pp.25-26.) The state then moved for a mistrial outside of the presence of the jury. (*Id.*, pp.26-27.)

> The trial court did not rule on the state's motion immediately, but instead gave Brackett the opportunity to respond and explain why he had violated several of the court's pretrial orders. (*Id.*, pp.27-28.) The court then took a recess to consider the state's motion and to review the applicable law. (Id., pp.28-29.) Following this recess, the court presented a potential curative instruction that it had drafted. (*Id.*, pp.29-30.) However, after inviting additional argument from both the state and Brackett (who opposed the motion), the court elected to

declare a mistrial. (*Id.*, pp.30-35). The court concluded that Brackett intended his comments to appeal to the sympathies of the jury, and that the curative instruction it drafted would not remedy the prejudice to the state caused by the comments. (State's lodging A-3, pp.1826-1828, 1843-1845, 2016-2018.) The trial court subsequently denied Brackett's numerous motions to dismiss the charges against him on double jeopardy grounds based on the mistrial. (*Id.*, pp.2106-2107, 2282-2283.)

Dkt. 37, pp. 34-35.

### A.  Standard of Law

The Double Jeopardy Clause of the Fifth Amendment attaches before a criminal judgment becomes final and protects the defendant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (internal citation omitted). The Idaho Supreme Court summarized the United States Supreme Court's reasoning on the balancing of competing interests when trial errors happen:

> While the double jeopardy clause protects against repeated convictions and prosecutions for the same crime, it does not mean that a criminal defendant is entitled to go free every time a trial fails to end in a final judgment. *Wade v. Hunter*, 336 U.S. 684, 688, 69 S.Ct. 834, 837, 93 L.Ed. 974, 977 (1949), *reh'g denied*, 337 U.S. 921, 69 S.Ct. 1152, 93 L.Ed. 1730 (1949). A criminal defendant may be retried if the first trial was prematurely terminated by the district court, without the defendant's consent, due to "manifest necessity." *United States v. Perez*, 9 Wheat. 579, 22 U.S. 579, 6 L.Ed. 165 (1824). This is so because the defendant's valued right to have the trial completed by a particular jury "must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade*, 336 U.S. at 689, 69 S.Ct. at 837, 93 L.Ed. at 978.

*State v. Manley*, 127 P.3d 954, 960 (2005).

In *Washington*, the United States Supreme Court  explained the importance of trial court discretion in weighing whether to attempt to cure a trial error or grant a mistrial:

> An improper opening statement unquestionably tends to frustrate the public interest in having a just judgment reached by an impartial tribunal. Indeed, such statements create a risk, often not present in the individual juror bias situation, that the entire panel may be tainted. The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline counsel, or even remove him from the trial as he did in *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267. Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred. The adoption of a stringent standard of appellate review in this area, therefore, would seriously impede the trial judge in the proper performance of his "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop … professional misconduct." *Id.*, at 612, 96 S.Ct., at 1082.
>
> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be. *See Wade v. Hunter*, 336 U.S. 684, 687, 69 S.Ct. 834, 836, 93 L.Ed. 974.
>
> Our conclusion that a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference does not, of course, end

the inquiry. As noted earlier, a constitutionally protected interest is inevitably affected by any mistrial decision.

    \* \* \*

Thus, if a trial judge acts irrationally or irresponsibly, cf. *United States v. Jorn, supra*; see *Illinois v. Somerville*, 410 U.S., at 469, 93 S.Ct., at 1072, his action cannot be condoned. But our review of this record indicates that this was not such a case. Defense counsel aired improper and highly prejudicial evidence before the jury, the possible impact of which the trial judge was in the best position to assess. The trial judge did not act precipitately in response to the prosecutor's request for a mistrial. On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial.

*Washington*, 434 U.S. at 512–16 (footnotes omitted). Importantly, a trial court need not use the specific words "manifest necessity" in its mistrial analysis to be upheld on review. *Id.* at 516-17.

### B.  State Court Decision

Petitioner presented his federal constitutional argument to the Idaho appellate courts in his direct appeal briefing. *See* State's Lodging A-9. The Idaho Court of Appeals determined that the trial court did not violate Petitioner's rights when it declared a mistrial, reasoning:

Here, the record is clear that Brackett's comments tainted the jury, prejudicing the state's case.

    \* \* \*

The United States Supreme Court has held that the trial court's determination to declare a mistrial is entitled to special respect where the trial court ordered a mistrial because the defendant's lawyer made improper and prejudicial remarks during his opening statement to the jury. *Arizona v. Washington*, 434 U.S.

MEMORANDUM DECISION AND ORDER - 48

> 497, 510 (1978). Neither party has a right to have a case decided by a jury which may be tainted by bias; in these circumstances, the public's interest in fair trials designed to end in just judgements must prevail over the defendant's valued right to have a jury concluded before the first jury impaneled. *Id*. at 516. Accordingly, we hold that the district court did not abuse its discretion in declaring a mistrial based upon its finding that the state's case was prejudiced by Brackett's comments and that the available remedy was inadequate to remove the taint from the jury.

*State's Lodging A-12*, pp. 9-10. The Idaho Supreme Court implicitly agreed by denying Petitioner's petition for review. *State's Lodging A-17*.

### C. Discussion

Because the Idaho Court of Appeals decided the claim on the merits, this Court reviews that decision under AEDPA's deferential standard. Petitioner argues that the State asked for a mistrial for two reasons: (1) to discover his defense strategy; and (2) to "jury shop," because the first jury "was seated by Rule (the venir) rather than preseating the venir by some computer program to which gives the State advantage." Dkt. 49, p. 8 (verbatim). Petitioner states, without any citation to the state court record, that the second jury venire was seated by a program that assigns "pro-prosecutor jurors" seats 1-50, and pro-defense jurors in seats 51-100. Dkt. 28, p. 9. Respondent counters that these are new arguments that have never been properly presented to the Idaho Supreme Court. This Court agrees that these arguments are not contained in Petitioner's direct appeal briefing in the state court record. *See State's Lodgings A-9 & A-11*.

Petitioner states that his direct appeal attorney refused to raised several issues Petitioner wanted him to raise on direct appeal, and this may explain why these arguments

are missing from the state court record. Here, there are no facts before this Court to analyze which computer program was used in jury selection and no explanation how it might have given the State an advantage. There is nothing showing that, even if such a computer program existed, the prosecutor was aware that the computer program would be used to pick a second jury if it requested a mistrial at the first trial. There is nothing in the existing record to suggest that the prosecution's request for a mistrial was sought for the purposes Petitioner suggests, rather than to prevent prejudice to the State because of Petitioner's violations of several pretrial rulings. The record reflects that the prosecution had ample evidence upon which to rely to make its case against Petitioner and had no reason to use surreptitious means to discover Petitioner's defense strategy.

Petitioner further argues that the trial court erred by failing to articulate a specific finding of "manifest necessity" and failing to directly question the jurors about their ability to serve without bias notwithstanding the opening statement misconduct. *Washington* specifically provides that a trial court need not use the words "manifest necessity" in its mistrial analysis and ruling. 434 U.S. at 516-17. After carefully considering the parties' points of view, reviewing the circumstances of the case, and crafting a potential curative instruction, the trial court decided that mistrial was appropriate. The record supporting that decision sufficiently reflects "manifest necessity" under *Washington.*

Petitioner also argues that the trial court should not have declared a mistrial without inquiring whether the jurors themselves felt they were prejudiced by his statements. However, there is no United States Supreme Court precedent to support such an argument. The act of questioning the jurors is not necessary and could have caused additional  harm.

Petitioner states that he wanted the jury "polled," but the purpose of having a jury polled is to permit an inquiry of individual jurors to ensure that each assented to a verdict that was reported to be unanimous, not applicable here. *See Humphries v. District of Columbia*, 174 U.S. 190 (1899). Further, the United States Supreme Court has never required a trial court to poll the jury before declaring a mistrial due to a deadlocked jury at the end of trial. *See Blueford v. Arkansas*, 566 U.S. 599, 609 (2012). "Polling" is not the appropriate legal mechanism upon which to base an argument that the trial court had a duty to question jurors about how his opening statement affected them.

The Idaho Court of Appeals' decision stands on solid ground. Both the Court of Appeals and this Court must extend deference to the trial judge who seated the jury and witnessed the opening statement. The record reflects that Petitioner's own decision to contravene court orders regarding permissible opening statement content caused the mistrial. He is not entitled to attempt to appeal to the sympathies of the jury on inappropriate grounds and also assert that he is entitled to have the potentially-biased jury decide his case, without regard to the public's interest in having an unbiased jury hear the case.

The AEDPA standard is extremely high. Habeas corpus relief is not warranted if fairminded jurists could disagree on the correctness of the state court's decision to deny relief on the double jeopardy claim. *See Richter*, 562 U.S. at 101. In other words, if one fairminded jurist would agree that the decision is reasonable, and another would agree with Petitioner that it is not, then habeas corpus relief is not warranted. This Court concludes that, not only could a fair-minded jurist agree with the state court's decision, but the Court

is quite certain that any fair-minded jurist would agree. Claim 2 will be denied on the merits.

### 3. Claim 3

Petitioner has articulated Claim 3 in the Amended Petition as follows:

> The district court abused its discretion by not allowing access to the evidence. They, (the courts and state) continue to manipulate the argument regarding this evidence to viewing the images themselves when in fact defense was intereste[d] in the "meta data" electronically stored information imbedded in the images. Information like times, dates, camera used to create said image etc. etc. This is how defendant started to learn that these images alleged came from different devices alleged. The only evidence from the state given to defense was edited, only what state picked out, this is why access was denied and exact copy denied and said "Oh the other stuff is irrelevant."

Dkt. 28, p. 10.

Petitioner asserts, "The defendant never seen, in his life, any SD card alleged." *Id*. (verbatim). Thus, he wanted to examine the SD card from which the exploitative photographs were restored. Petitioner describes his attempts to examine this evidence as follows:

> [T]the Petitioner never received an exact copy of the SD card alleged, only a copy of what detectives requested from the SD card be imaged and the "forensic" report thereof. So, the Petitioner only received what the detectives requested be given and the forensic report in support of only that (that was called the 501 CD throughout this case). The Petitioner on multiple occasion/motions requested an exact mirror image of everything discovered from the devices and SD card alleged (this was known as the "Holy Grail" or 401 CD). The Petitioner made the mirror image request by way of Rules of Evidence regarding authenticity Rules of Evidence 1001-1004.

Dkt. 49, pp. 15-16 (verbatim).

MEMORANDUM DECISION AND ORDER - 52

### A.  Construction of Claim

Here, because Petitioner continues to make his claim somewhat amorphous, the Court considers it in the most expansive way possible from the record. That is, the Court assumes for the sake of argument that (1) Petitioner and his investigator were provided with several copies of the expert's forensic report, copies of the photographs that were retrieved from the SD card found at Petitioner's house, and copies of the photographs that were retrieved from Jack Omohundro's camera and/or computer in preparation for the first trial only; (2) Petitioner and his expert were granted access to the original cameras and SD card, but Petitioner and his expert never examined the SD card; and (3) Petitioner was denied access to any and all of the electronic evidence between his first and second trial. Given these assumptions, the Court considers whether this set of circumstances constitute a due process violation, as the Idaho Court of Appeals determined, and, if so, whether it was harmful to his defense.

### B.  Standard of Law

Under the Fourteenth Amendment's Due Process Clause, a defendant must have a meaningful opportunity to present a complete defense, including having access to the evidence to be used against him. *California v. Trombetta*, 457 U.S. 479, 485 (1984). There is no United States Supreme Court case specifically on point with the particular procedural posture and unusual facts of this case. Lower federal court cases help inform how *Trombetta* should be applied, but are not cases of precedent under §2254(d)(1).

Federal courts have encountered a similar "right to review exploitative electronic evidence" argument in the face of the Adam Walsh Child and Protection Safety Act of

2006, which prohibits the redistribution of child pornography to prevent revictimization, even in the course of discovery. *See State's Lodging A-9*, p. 48 (Adam Walsh Act referenced in Petitioner's direct appeal opening brief). For example, in *United States v. Mitchell*, 128 F. Supp. 3d 1266, 1266 (E.D. Cal. 2015), the defendant sought an order compelling the government to provide him with a "mirror copy" of the computer media seized from him. He proposed that the copy be provided under a protective order requiring confidentiality and limiting access to defense attorneys, paralegals, and experts. The government refused to produce the materials under any circumstance. The court determined that the Act "provides only that the defendant be given 'ample opportunity' to examine the evidence," *not* the right to have it copied. *Id*. at 1276.

Another factor that must be weighed in Petitioner's particular case is the conflict between the Sixth Amendment right of self-representation and the coverage of the Six and Fourteenth Amendment due process rights to a fair trial. This conflict naturally occurs when a jailed pro se defendant must prepare his defense despite the inherent difficulties of being incarcerated. *See The Jailed Pro Se Defendant and the Right to Prepare A Defense*, 86 Yale L.J. 292, 316 (1976) (suggesting the appointment of standby counsel to help smooth out "the rough edges" of pro se criminal pretrial detainee litigation).

In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized a defendant's Sixth Amendment right to conduct his own defense. The Court also held that a trial court may appoint "standby counsel" to assist the pro se defendant in his defense if the defendant agrees. *Id*. at 834, n.46; *see McKaskle v. Wiggins*, 465 U.S. 168, 187-188 (1984). However, neither *Faretta* nor any subsequent United States Supreme Court case

addresses the issues present in this case. In *The Jailed Pro Se Defendant and the Right to Prepare A Defense*, the author observed:

> The *Faretta* decision, it is true, makes scant mention of the difficulties a pro se defendant may expect in presenting his defense, and no mention at all of his difficulties in preparing one. The decision casts much light around the historical base of the right to self-representation, but leaves in darkness the procedural superstructure which the trial courts must erect upon that base.

86 Yale L.J. at 301–02.

The United States Supreme Court has provided no clear guidance to fill that gap. In 2005, that Court observed, "*Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant," but it did not give any further clarification. *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curiam). In *Kane*, the Court held that a defendant who elected to proceed pro se on state court charges did not have a viable habeas corpus claim on the basis that he was denied access to a law library during pretrial confinement. *Id*. ("[T]he court below … erred in holding, based on *Faretta*, that a violation of a law library access right is a basis for federal habeas relief."); *see also United States v. Sykes*, 614 F.3d 303, 311 (7th Cir. 2010) (stating that the "rule is that the defendant has the right to legal help through appointed counsel, and when he declines that help, other alternative rights, like access to a law library, do not spring up."). (internal quotation marks and alterations omitted).

In *Faretta*, the Supreme Court stated that the right of self-representation does not equal a license not to comply with relevant rules of procedural and substantive law. 422 US at 834 n.46. In addition, under the Sixth Amendment, "a defendant's right to present

relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "A defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process,'" and "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials" so long as the rules are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Id*. (citing *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987).

Indigent defendants are entitled to the basic tools of an adequate defense, including the provision of expert assistance at public expense when such is necessary for a fair trial. *Ake v. Oklahoma*, 470 U.S. 68, 82–83 (1985). However, an indigent defendant does not have a constitutional right "to choose an [expert] of his personal liking." *Id.* at 83.

Piecing together a guide for trial courts that balances an indigent pretrial detainee's due process right to prepare for trial with the limitations he has imposed on himself by invoking the right of self-representation, this Court concludes that incarcerated pro se defendants need not be granted everything they want simply by invoking the *Trombetta* due process right to present a defense, but they must work within reasonable, case-specific parameters set by the trial court. If defendants reject the regular aids set up to facilitate their due process rights, such as expert witnesses and standby counsel, that is a detriment they implicitly have agreed to bear. A decision of a pro se person acting as his or her own counsel cannot later be challenged as ineffective. *See Wiggins*, 465 U.S. at 177 n.8.

On federal habeas corpus review, "petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*,

576 U.S. 256, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).) The United States Supreme Court has clarified that, when a state appellate court has undertaken a harmless error review under *Chapman v. California*, 386 U.S. 18 (1967), the federal district court reviewing the decision under § 2254 applies the harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review"). Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638. Under the *Brecht* harmlessness analysis, "if a judge is in grave doubt" about the effect of the error on the jury, the error is deemed harmful. *O'Neal v. McAninch*, 513 U.S. 432, 438-39 (1995).

### C.  Subclaim 3(b)

The Court first considers Subclaim 3(b), because it provides a context for consideration of Subclaim 3(a). Claim 3(b) is an alleged denial of due process resulting from the trial court denying his request to access the forensic and electronic evidence during the time period in between the two trials (the court reasoned that Petitioner had been prepared for the first trial and had caused the mistrial, and thus he was already prepared for the second trial); As above, the general standard of law governing this claim is that a defendant is guaranteed the Fourteenth Amendment right to a meaningful opportunity to present a complete defense, including having access to the evidence to be used against him. *Trombetta*, 457 U.S. at 485.

i.    State Court Decision

As to subclaim 3(b), the Idaho Court of Appeals concluded that, even though Petitioner had ample opportunity to access State's Exhibit 30 (CD 1 and 2 containing the forensic report and photographs) and Exhibit 23 (the Omohundro CD) before his first trial, the trial court violated his due process rights by failing to allow him additional access for trial preparation before his second trial. *State's Lodgings A-12*, p. 13; A-3, pp. 2196-98, 2274-2277.

However, the Idaho Court of Appeals concluded that this error was harmless:

> Brackett claims that denying him access to the evidence during the three months before the second trial meant that he could not review the images the state alleged to be sexually exploitative as he readied himself for the second trial and impacted his ability to prepare a defense. The images had not changed and allowing Brackett to access and view the images, some of which were images of the victim's genitals, would not have changed whether they were sexually exploitative. Brackett was aware of the images and knew what they depicted, based upon his prior access, sufficient to prepare a defense to whether they were sexually exploitative. Accordingly, the district court's denial of access was harmless error.

*Id.*, p. 14.

ii.    Discussion

This Court agrees that Petitioner's due process rights were violated when he was not given access to evidence between the two trials. To show that the error was harmful to his defense, Petitioner argues that he could have found metadata on the SD card showing that the photographs were not taken from the SD card in *his* camera, but were taken from Jack "Bud" Omohundro's Samsung camera, which was the same color and model of

Petitioner's. *See* Dkt. 49-11, p. 2. Had he been able to compare the metadata from the original SD card and the Omohundro metadata, he argues, he would have been permitted to introduce the Omohundro CD to the jury to show that Omohundro had clothed photographs of N.B., as well as pornographic photographs of adult women, on his camera. Dkt. 49, pp. 65-66.

The question on habeas corpus review is whether the Idaho Court of Appeals' decision that the error did not harm Petitioner's defense is contrary to, or an unreasonable application of, United States Supreme Court precedent. In other words, did Petitioner's lack of access to the electronic materials in the three months prior to the second trial foreclose his ability to assert that Omohundro was an alternative perpetrator, or did the denial otherwise prejudice his defense?

During the first trial, the Twin Falls County Jail made accommodations to allow Petitioner the opportunity to access the original SD card and the forensic report, which contained the exploitative photographs of the victim, Petitioner's body, and Petitioner's genitals. *See* State's Lodging A-3, p. 2113. No new evidenced was added by the State during this time period. The trial transcript, in fact, reflects that Petitioner had sufficient familiarity with the photographic evidence that he was able to point to those photographs he believed did not match his body features and compare them to other photographs of his body. *See State's Lodging A-7*. He had familiarity with the forensic report and the metadata for the photographs, shown by the detailed manner in which he cross-examined the forensic expert. *See id*. Here, Petitioner has not shown that examining the evidence a second time would have enabled him to make the offer of proof required to present evidence to the jury

that Omohundro, not Petitioner, took the nude photographs of N.B.

Even assuming Petitioner would have been able to introduce the Omohundro CD, the totality of the evidence against Petitioner remains overwhelming. Officer Todd Rudner testified that, in reviewing a jail conversation between Petitioner and Brandon Estes, Petitioner referred to N.B. and himself as "a couple." *State's Lodging A-7*, p. 951. Petitioner's own adult daughter testified that she saw the couple holding hands, that she saw the minor victim kiss Petitioner on the lips, and that the minor victim slept in Petitioner's bedroom. *State's Lodging A-7*, pp. 2559-2561. Telephone records showed that Petitioner and the victim had 158 phone contacts in October 2010; 365 in November 2010, and 84 in December 2010. There were 24 calls exchanged between them on January 3, 16 calls on January 4, and 26 calls on January 5. *State's Lodging A-7*, pp. 954-975. N.B. testified that she spent the entire two weeks of winter school vacation at Petitioner's house, accounting for the reduced number of calls; the couple broke up in early January. *See id*., pp. 314-315.

N.B. also testified that Petitioner persuaded her to keep the relationship secret, and that he often kept his face hidden when they were out in public together. *State's Lodging A-7*, pp. 262-266. The prosecutor introduced Exhibit 22, a photograph of Petitioner and N.B. to illustrate that Petitioner "wore [his] hoodie … pulled up, kind of over his face." *Id.*, p. 516. *See id*., pp. 2822 (referencing State's Exhibits 20 and 21, where Petitioner wore a hood and a mask). N.B. wrote Petitioner a set of love poems, one of which discussed him being "always hooded and/or hatted." *Id.*, p. 515. Another poem titled, "Our Love," contained a phrase, "Nobody needs to know about us." *Id.*, p. 263. N.B. testified that she

MEMORANDUM DECISION AND ORDER - 60

wrote that because Petitioner "asked me not to tell anybody …. [t]hat me and him were dating." *Id*.

Cell phone evidence showed that N.B. and Brackett utilized the code number "123" to mean "I love you," *State's Lodging A-7*, p. 265, "456" to indicate "I miss you," *id*., and "911" to communicate any concern that someone was becoming suspicious of their relationship, or that either of them was in trouble. *Id*., p. 266. During a recorded confrontation call between N.B. and Petitioner that was arranged by authorities and admitted into evidence, Petitioner said "911." *Id*., pp. 539-545. The officer who arranged the confrontation call interpreted Petitioner's use of that code number as an indication that Petitioner knew N.B. had gone to the police. *Id*., p. 545.

The belt buckle, shoes, and pants in the exploitative photos were identified as Petitioner's. The belt buckle retrieved from the jail is the same belt buckle in some of the photographs; the victim also identified the belt buckle as one Petitioner wore every day. *State's Lodging A-7*, pp. 82-85. White Adidas tennis shoes with a black stripe were found at Petitioner's home, were seen in some of the photographs, and were mentioned by Petitioner in a telephone call while at the jail. *Id*., pp. 986-989. Petitioner also mentioned in the telephone call that the black Aeropostale pants—which were also in the photographs—were his favorite pair of pants. *Id*., p. 1131.

Petitioner's defense surrounding the Omohundro photos is unclear. Petitioner would have been left to argue that Omohundro took the intimate photos of Petitioner and N.B., which meant Petitioner would essentially be admitting to the other set of charges related to having a sexual relationship with a minor, *or* Petitioner would have had to argue that

Omohundro was wearing Petitioner's pants, belt, and shoes in the photographs. An argument that another man would be both wearing Petitioner's clothing and being photographed with a teen that *Petitioner* treated as *his* girlfriend is unconvincing.

The investigator testified at trial that, after comparing the photographs from the camera to the photographs taken of Petitioner during the warrant of detention, "[t]here was a – like a mark or a blemish that was on his right hand that appeared to be consistent with the photograph of the right hand that was holding the penis in [N.B.'s] mouth." *State's Lodging A-7*, pp. 1190-1195. Petitioner himself testified, "It looks to be my hand" in the photo holding the penis, but added, "I don't know how they did it or what they did," insinuating that his hand was photoshopped into the photo by investigators." *Id*., p. 2687.

 The jury had three and half weeks of trial to assess the credibility of the minor victim and the forensic investigators versus the credibility of Petitioner. *See State's Lodging A-7*. Given the presence of Petitioner's belt buckle, pants, shoes, and hand in the photographs that were the subject of the criminal charges (and the phone calls, the kissing, the handholding, and the shared bedroom), it is unlikely that the jurors would believe that Jack "Bud" Omohundro was snapping nude photographs of Petitioner and N.B. (or even less likely, that Omohundro was snapping nude photos of himself and N.B.), rather than believe that Petitioner was taking nude photographs of himself and his teenaged girlfriend, because she *was*, in actuality, his girlfriend, and Petitioner had taken his girlfriend to Omohundro's rented space to use the exotic dancer's "stripper pole," as N.B. called it, for a backdrop. *See id.*, p. 271.

Petitioner's argument that his conviction is invalid rests on allegations of  a

government-wide conspiracy to manufacture evidence to find him guilty. Petitioner was able to point out several minor technical discrepancies in the forensic photography recovery process, but his hours-long cross-examination of Detective Lukasik only highlighted that the detective was both skilled and careful in his occupation. Petitioner's cross-examination of the State's witnesses revealed no bias or prejudice showing that one or more of them had any motive or ability to "photoshop" Petitioner's pants, belt buckle, shoes or hand into the photographs. Petitioner has not, in all the years since his conviction, been able to show how his defense would have been strengthened had he personally been given access to the evidence during the three-month trial gap.

Petitioner also complains that he was not permitted to point to N.B.'s father or Mr. Cerimovic as alternative perpetrators. The court made it clear in pretrial proceedings that alternative perpetrator evidence would be inadmissible absent an offer of proof, during the trial, establishing the direct connection between the alleged perpetrator and the crimes at issue here. *See State's Lodgings A-3,* p. 1620; A-7, p. 1507.[6] Whether other adult males perpetrated sexual crimes upon N.B. is not relevant to the particular acts charged against Petitioner.[7] In all the years since his conviction, he has not shown that the hand in the

---

[6] In *Hartman v State,* 376 N.E. 2d 100 (Ind. App. 1978), the court rejected the defendant's contention that the trial court had erred in prohibiting him from presenting his alibi defense because of his failure to file a timely and correct notice of alibi when he was acting as his own attorney. The court held that, although some allowance is made for persons proceeding without counsel, a defendant acting as his own counsel must be held to the established rules of procedure, the same as trained legal counsel. Pointing out that the defendant's failure to meet the statutorily required conditions precedent to admission of alibi evidence was contrary to the purpose of the alibi notice statute, the court concluded that the trial court was acting within its discretion in granting the prosecution's motion to keep out the alibi defense.

[7] Mr. Brown, when representing Petitioner, filed a notice of intent to introduce Rule 412 (non-rape shield) evidence, which was that a 20-year-old man named Andy Anderson had sex with N.B. after N.B. went to his house to receive comfort when she was having problems with Petitioner sometime between October

photograph belonged to any of the alternative perpetrators. He has not shown that any of these men borrowed his shoes, his favorite pants, and the belt buckle he wore every day.

Habeas corpus relief on subclaim 3(b) is not warranted because Petitioner has not shown that being deprived of access to the State's evidence between the two trials rendered the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294, or that non-accessibility during that time frame had a "substantial and injurious effect or influence" on the jury's verdict, *Brecht*, 507 U.S. at 637. The error was harmless.

### D.  Subclaim 3(a)

Subclaim 3(a) is whether it was error for the state district court to fail to provide the *original* SD card from the Samsung camera found at Petitioner's house, or an exact copy of that SD card, to Petitioner for his examination, rather than providing *only the data that the State asked for* that was allegedly found on the original SD card. Petitioner's appellate counsel characterized this claim on appeal as whether Petitioner's *expert* was entitled to access to the original or an exact copy of the SD card. *See State's Lodgings A-9*, pp. 51-53; A-3, pp. 2274-77.

#### i.  State Court Decision

The Idaho Court of Appeals decided subclaim 3(a) (couched in terms of denial of access of Petitioner's expert—because that is how Petitioner's appellate counsel presented it) on procedural grounds and alternatively on the merits. As to the original SD card, the appellate court first determined that "[i]t is uncontested that under Rule 16(m)(3) an

---

2010 and January 2011. *See State's Lodging A-3*, pp. 451-453. The trial court ruled the evidence inadmissible. *Id*., pp. 504-513.

individual who Brackett might seek to qualify as an expert, such as an independent analyst, was entitled to access the SD card had Brackett moved the court to allow an expert access to the evidence." *State's Lodging A-12*, p. 12. But, the Court of Appeals continued, Petitioner never requested that of the trial court, and, thus, the claim was not properly preserved for appeal. *State's Lodging A-12*, p. 12 (relying on *State v. Fodge*, 824 P.2d 123, 126 (1992)).[8] This factual finding is technically correct, because, though Petitioner sought access to the original camera and SD card for his first expert, he never requested that same access for his second expert. Petitioner later sought access only for himself, but, by that time, the first trial had begun and ended, and the trial court would not require a new jail to provide special access for Petitioner, given that he was already on notice of the evidence the prosecution planned to use at trial.

As to an exact copy of the SD card, the Idaho Court of Appeals held that "the district court did not err in denying Brackett's request for a *copy* of the SD card or forensic report, which contained sexually exploitive materials," because Idaho Criminal Rule 16(m) provides that a court shall deny any request to reproduce sexually exploitive material. *Id.*, p. 12.

Despite the procedural default of the claim that Petitioner's expert did not have access to the *original* SD card, the Idaho Court of Appeals went on to conduct a harmless error review. The Court of Appeals concluded that, even if the trial court erred, the error

---

[8] This ground is considered an adequate and independent state procedural ground for refusal to hear a claim on appeal because it is a longstanding rule of the Idaho Supreme Court. *See, e.g., Gosch v. Idaho*, 2017 WL 4820348, at *3 (D. Idaho Oct. 25, 2017).

was harmless because "there is nothing in the record that suggests Brackett had access to the sophisticated software needed to restore and access the deleted contents." *State's Lodging A-12*, p. 13. "Thus," the court concluded, "granting Brackett access to the original SD card or an exact copy thereof would have been of no benefit to Brackett in preparing his defense." *Id.*, pp. 13-14.

    ii. <u>Discussion</u>

   This Court concludes that it was a due process error to withhold the original SD card used in the detective's forensic analysis when Petitioner asked to examine it in between the two trials. However, before the first trial ended in mistrial, there was no due process violation, because there was a standing order that Petitioner and his expert could examine the original evidence.[9]

    But, like the Idaho Court of Appeals, this Court concludes that the error was harmless.

   Here, Petitioner argues:

> What they [local authorities] did exactly your Honor is they retrieved images from multiple devices and/or the search of Jack Omohundro's home on 6-9-11 loaded them on to an "Acer" computer got an SD card, (the one alleged) and downloaded the images from the computer to the SD card alleged and said they found it in a camera retrieved from my daughter. This is why I wasn't allowed a mirrored image of SD card alleged, to continue to view evidence after mis-trial and/or an expert of my choosing after the McLaughlin "crook" expert that "worked for the court," not Petitioner.

---

[9] While the examination order specifies Petitioner's first expert's name, it is abundantly clear from the record that the court substituted Petitioner's second expert, Mark McLaughlin, for all purposes and would have permitted Mr. McLaughlin to examine the evidence had Petitioner not refused to use him.

Dkt. 49, pp. 17-18.

First, this Court agrees with the Idaho Court of Appeals that, even if Petitioner had been given access to the original SD card, he has not demonstrated that he had access to the specialized software or equipment necessary to forensically analyze the electronic data himself. Petitioner argues that he should have been given access to the software to review the original SD card. The Court disagrees. Simply because Petitioner chose to represent himself does not mean that he was entitled to have personal access to the software an expert would have—Petitioner had the choice to continue to employ the expert chosen by Petitioner and appointed by the court to be able to have that access, but he chose not to continue to employ Mr. McLaughlin and has not shown adequate reason why he should have been able to change experts.[10] Petitioner has not shown he had the ability to hire a different expert on his own without public funding. Therefore, due process did not require Petitioner to have both access to the original evidence *and* the software to review it himself or a *third* publicly-funded expert of his choice.

Addressing Petitioner's argument that access to the original SD card would have helped him prove that the photographic evidence was fabricated by law enforcement officers, the Court finds that Petitioner has not provided sufficient admissible evidence that Detective Lukasik or Officer Barzee (or anyone else) altered the evidence, as Petitioner suggests, either as part of a larger conspiracy or for the investigator's own purposes. *See State's Lodging A-3*, pp. 2206, 2283. Petitioner's conspiracy theory includes (1) that

---

[10] McLaughlin's curriculum vitae is found at A-4, pp. 138 -139.

investigators did not obtain the SD card from his residence but "planted it" in the camera, (2) that investigators took photos from Omohundro and placed them on the SD card, (3) that investigators photoshopped his hand onto the penis photograph, (4) that investigators altered the telephone message to his daughter asking her to erase the photographs, (5) that the prosecutor had a scheme to launder a payment to the victim through an otherwise legitimate counseling service, and (6) that the prosecutor brainwashed and coerced the Petitioner into lying at the trial. Somewhere in the mix of things, Petitioner was also asserting that it was not he who carried on a sexual relationship with N.B., but instead it was Andy Anderson, Senad Cerimovic, or N.B.'s father.

To the contrary, all of the other evidence naturally and readily points to Petitioner as the perpetrator. No habeas corpus relief is warranted because there is no evidence that Petitioner could have made use of the SD card without the aid of additional software or a third expert—neither of which he was entitled to. The court's refusal to permit Petitioner to examine the original SD card was harmless error. The error did not render the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294, nor did it have a "substantial and injurious effect or influence" on the jury's verdict.

### 4.  Claim 4

Claim 4 is that the "money judge" appointed to consider Petitioner's requests for funding for investigative and expert services violated his constitutional rights by limiting his requests for additional funding.

### *A.  State Court Decision*

The Idaho Court of Appeals analyzed and rejected Petitioner's claim as follows:

MEMORANDUM DECISION AND ORDER - 68

In this case, the money judge considered Brackett's request to appoint a third expert and determined that an adequate defense was available without the assistance of the third expert. As the United States Supreme Court held, an indigent defendant does not have a constitutional right "to choose an [expert] of his personal liking." *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096, 84 L.Ed.2d at 66. The money judge found that the second expert was competent and willing to adequately provide the services sought by Brackett in preparation of his defense. In addition, the money judge indicated to Brackett that it was "likely" that it would grant additional funds for the second expert to continue working on Brackett's case. However, Brackett failed to follow the proper procedure to seek funds and utilize his expert's assistance. The money judge's decision to deny Brackett's request for funds for a third expert was not clearly erroneous or unsupported by the circumstances of the case. Accordingly, Brackett has not shown that the money judge abused its discretion in denying Brackett's request for funds to hire a third expert.

*State's Lodging A-12*, pp. 14-18.

### B.  Standard of Law

The Idaho Court of Appeals set forth the correct clearly-established law: *Ake v. Oklahoma*, 470 U.S. at  82–83 (holding that the Constitution guarantees an indigent defendant access to a "competent" expert, chosen by the trial court, who will conduct an "appropriate" examination of the evidence and "assist in evaluation, preparation, and presentation of the defense," but not an expert "of his personal liking"); and *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) (reiterating that "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense.").

### C.  Discussion

In this action, Petitioner explains his problems with Mr. McLaughlin as follows:

The second [expert] McLaughlin would not talk with me until

MEMORANDUM DECISION AND ORDER - 69

he was appointed, so once he was appointed he would not adhere to my request to come and view evidence with me to prepare for a suppression hearing, said he "listens to the court not" me. And got the $5000.00 without the "defendant" providing any request or affidavit to support the expenditure of any public funds as required. The court said it would allow more funds but not a different expert showing the interest of keep this "McLaughlin." The defense had multiple other experts ready some for even less money and that the defense trusted. Once "McLaughlin" (expert) took (without any "request," "motion," affidavit" from the defendant as required) the $5000.00 allowed for absolutely no digital evidence investigating, the defendant had absolutely no confidence in this person. And if additional funds are available upon request who cares what expert the defense requests. As long as their (the expert) resume (CV) checks out. More due process and purposeful violations of fundamental fairness "manifest constitutional error" "clear manifest constitutional error."

Dkt. 28-1, p. 4 (verbatim).

Petitioner demanded a third expert be appointed, but the state court reasonably declined. The state court clarified:

This court has not denied the defendant the appointment of an expert. The appointment of Mark McLaughlin is still in effect and there is no showing that Mr. McLaughlin is unable to provide the expert assistance and services required by the defendant or that he is otherwise unqualified. The mere fact that the defendant may have an unsubstantiated lack of confidence in Mr. McLaughlin is not a legitimate basis to appoint yet another expert.

State's Lodging A-4, p. 277.

Petitioner provides no adequate reason why the second expert should not have been permitted to continue his work on the case, rather than having a third expert redo and charge a third time for the foundational work completed by the first and second experts. Petitioner argued that he would engage an expert only if the expert would let him sit beside him

MEMORANDUM DECISION AND ORDER - 70

throughout the expert's analysis of the photographic evidence, and only the third expert indicated that Petitioner could help him in such a manner. Petitioner's right to have expert assistance at taxpayer expense does not extend that far. *State's Lodging A-4*, pp. 230-39.

The state district court and the Idaho Court of Appeals found that Petitioner did not show that the second expert was not competent; could not perform an adequate examination; or could not assist in the evaluation, preparation, and presentation of Petitioner's defense in a reasonable manner. *See State's Lodging A-4*, pp. 240-244, 323-25, 368-371. Petitioner has not rebutted this finding with clear and convincing evidence.

Petitioner believed that McLaughlin charged too much for the preliminary work he had done; however, the court approved the work and had him paid over Petitioner's objection. There is insufficient evidence in the record showing that McLaughlin was "crooked," untruthful, or incompetent. Because there is no adequate reason in the record why the second expert should not have been permitted to complete his work or could not have adequately assessed the electronic evidence, the Court agrees that Petitioner has failed to show that the Idaho Court of Appeals' decision was contrary to, or an unreasonable application of, United States Supreme Court precedent. Petitioner is not entitled to relief on Claim 4 under AEDA's deferential review standard.

### 5. Claim 5

Petitioner asserts that cumulative error combined in his case to cause prejudice to his defense.

#### A. Standard of Law

A cumulative-error analysis aggregates all errors found to be harmless and analyzes

whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless, and the court considers whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors. The United States Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Chambers v Mississippi*, 410 U.S. 284, 290 n. 3, 298, 302-03 (1973). The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294, and thereby had a "substantial and injurious effect or influence" on the jury's verdict*, Brecht*, 507 U.S. at 637 (internal quotations omitted). *See, e.g., Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002)(cumulative trial errors required grant of relief).

### B.  State Court Decision

The Idaho Court of Appeals rejected Petitioner's cumulative error claim on appeal, concluding that:

> [A] necessary predicate to the application of the doctrine is a finding of more than one error. *Id*. Brackett has only shown that the district court erred in denying him access to evidence. Accordingly, Brackett has failed to demonstrate at least two errors, a necessary predicate to the application of the cumulative error doctrine.

*State's Lodging A-12*, p. 18.

MEMORANDUM DECISION AND ORDER - 72

### C. Discussion

This Court agrees. Even if the subclaims regarding the forensic photographic evidence is considered two errors, rather than one—that Petitioner did not have access to an exact copy of the SD card because he did not comply with court's rulings on the expert witnesses and he did not have access to that or any of the other previously-reviewed evidence for three months in between the trials—the other evidence against Petitioner is overwhelming. There is nothing in the record showing that, had Petitioner had access to the evidence between trials that the State's evidence would have been far less persuasive. The State's evidence was not just plentiful, but varied, as set forth above.

### 6. Claim 6

Even though the Court has concluded that Claim 6 is procedurally defaulted, it will review the merits of the claim. It must do so do novo, because the Idaho appellate courts did not render a decision on the merits of this claim. Petitioner asserts that Idaho Code § 18-1508A, the statute pursuant to which Brackett was convicted of five counts of sexual battery of a minor, is unconstitutional because it precluded him from presenting a complete defense. *See State's Lodging A-3* (Counts IX-XVI). In particular, he asserts that the statute should have required the State to prove that Petitioner knew that the victim was a minor at the time he engaged in sexual relations with her.

The statute at issue, I.C. § 18-1508A (1992), provides:

> SEXUAL BATTERY OF A MINOR CHILD SIXTEEN OR
> SEVENTEEN YEARS OF AGE — PENALTY. (1) It is a
> felony for any person at least five (5) years of age older than a
> minor child who is sixteen (16) or seventeen (17) years of age,
> who, with the intent of arousing, appealing to or gratifying the

lust, passion, or sexual desires of such person, minor child, or third party, to:

(a)  Commit any lewd or lascivious act or acts upon or with the body or any part or any member thereof of such minor child including, but not limited to, genital-genital contact, oral-genital contact, anal-genital contact, oral-anal contact, manual-anal contact or manual-genital contact, whether between persons of the same or opposite sex, or who shall involve such minor child in any act of explicit sexual conduct as defined in section 18-1507, Idaho Code; or

(b)  Solicit such minor child to participate in a sexual act; or

(c)  Cause or have sexual contact with such minor child, not amounting to lewd conduct as defined in paragraph (a) of this subsection; or

(d)  Make any photographic or electronic recording of such minor child.

Petitioner asserts that the victim "falsified her identification" and admits to entering adult establishments, bars, and nightclubs. Dkt. 49, p. 34. At trial, Petitioner elicited testimony from a witness that he saw the victim using a fake ID to purchase items. Another witness testified to having met the victim in a bar. The victim herself admitted to going into bars. However, the victim and her friend testified that, when they first met Petitioner they told him how old they were—sixteen. *State's Lodging A-7*, pp. 218, 528-529. Petitioner testified contrarily, even though he knew Petitioner was in high school, lived at home, and had a fake ID, and therefore, should have inquired about her true age from another reliable source. The fact that Petitioner hid his face in public when he was with N.B., told her to keep their relationship a secret, and never met her parents are indications that Petitioner knew there was something wrong with carrying on the relationship.

MEMORANDUM DECISION AND ORDER - 74

### A.  Standard of Law

Courts have universally rejected the "I-didn't-know-my-sexual-partner-was-a-minor" defense as to "statutory rape" offenses in both state and federal jurisdictions. Rather, "statutory rape is a recognized judicial exception to the general principle that mistake of fact is a defense if it negatives the existence of a mental state essential to the crime charged." *United States v. Juvenile Male*, 211 F.3d 1169, 1170–71 (9th Cir. 2000) (per curiam) (internal quotation omitted); *see also Morissette v. United States*, 342 U.S. 246, 251 n. 8 (1952) (noting that common-law commentators recognize statutory rape as an exception to general principles of criminal intent). "Accordingly, federal courts uniformly have rejected claims that the Constitution requires the government to prove that a defendant charged with statutory rape knew that the victim was underage, or that such a defendant has a constitutional right to the defense that he made a reasonable mistake as to the victim's age."); *United States v. Wilcox*, 487 F.3d 1163, 1174 (8th Cir. 2007)(collecting cases).

In *United States v. Brooks*, 841 F.2d 268 (9th Cir. 1988), the court held that there was no defense of reasonable mistake of age to the charge of statutory rape because Congress failed to provide for such a defense in the statute. *Id*. at 269. The court therefore "infer[red] that [Congress] accepted the established judicial interpretation of the offense of statutory rape." *Id*. When a court construes a statute, "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law." *Cannon v. University of Chicago*, 441 U.S. 677, 696–97 (1979). The *Brooks* court concluded:

Brooks suggests that section 2032 violates due process

MEMORANDUM DECISION AND ORDER - 75

because it imposes strict liability in a fundamentally unfair manner, since he may not have had an opportunity to know the age of the female. No federal court has so held. We see no reason to depart from the observation of the First Circuit which rejected a similar constitutional attack on a state statutory rape law. It stated [t]he Supreme Court has never held that an honest mistake as to the age of the prosecutrix is a constitutional defense to statutory rape ... and nothing in the Court's recent decisions clarifying the scope of procreative privacy [citations omitted] suggests that a state may no longer place the risk of mistake as to the prosecutrix's age on the person engaging in sexual intercourse with a partner who may be young enough to fall within the protection of the statute. Petitioner's argument is without merit.

841 F.2d at 270.

### B.  Discussion

The Court concludes that Petitioner's argument has no support in the law. Because Idaho lawmakers did not include a defense of lack of knowledge of the victim's age, the Court cannot insert one, but must assume that the lawmakers knew and rejected that option. Neither does the Court have any reason to depart from those courts holding that the failure to include such a defense does not violate the federal Constitution. Accordingly, Claim 6 is denied on the merits under a de novo review standard.

**CONCLUSION**

From the thickets of the forest, it may be difficult for Petitioner to see how overwhelming the evidence against him is, but an objective adult with a view of the entire landscape can come to no conclusion other than that Petitioner made a very grave decision—either with knowledge of the victim's age (as the victim and her friend testified) or with "purposeful ignorance"—to carry on a sexual relationship with a minor and to

MEMORANDUM DECISION AND ORDER - 76

photograph the minor nude. Reasonable adults would have taken steps to determine if a high school junior was an adult before doing what Petitioner did with the victim. Reasonable adults would have checked the true age of a high school student who was known to carry a false ID card. The law is intended to protect minors from sexual exploitation, even if the minors act badly sometimes, because that is, after all, a normal feature of a child. This case is a prime example of why the law exists and how its existence protects minors to the degree it can when adults choose sexual gratification over the welfare of a person whom society has designated a child.

Petitioner's claims fail on the merits, and some are barred on procedural grounds, but the Court has nonetheless addressed them on the merits. This Court agrees with the Idaho Court of Appeals that the due process violation depriving Petitioner of the electronic evidence for the three months between trials did not have a substantial and injurious effect or influence in Petitioner's trial. Petitioner was thoroughly familiar with the subject matter of the photographs. He chose to dismiss his appointed expert and had no means to do the type of forensic analysis that expert could have done with specialized software. The evidence against Petitioner was overwhelming. The theory that government officials conspired against him in all of the ways discussed above has no support and is simply implausible, given the State's overwhelming evidence. Petitioner's other claims do not warrant relief. This entire action will be dismissed with prejudice.

The Court does not find its resolution of any claim in this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

MEMORANDUM DECISION AND ORDER - 77

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion Requesting Oral Argument or to Appoint Counsel (Dkt. 54) is DENIED in part; Petitioner's Motion for a Ruling (Dkt. 54) is GRANTED in part.

2. The Amended Petition, and this entire case, are DISMISSED with prejudice.

3. No certificate of appealability will issue. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: October 20, 2021

David C. Nye
Chief U.S. District Court Judge